Kevin P. Rooney, #107554
Of Counsel, HAMMERSCHMIDT LAW CORPORATION
2445 Capitol Street, Suite 150
Fresno, CA 93721
Tel: (559) 233-5333
Fax: (559) 233-4333

Attorney for Defendant, KENNETH SHANE PATTERSON

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>KENNETH SHANE PATTERSON,<br><br>　　　　Defendant. | Case No.: 1:19 CR 230 DAD/BAM<br><br>DEFENDANT'S BRIEF ADDRESSING POTENTIAL DETENTION ORDER AT INITIAL APPEARANCE REGARDING ALLEGED VIOLATION OF PRETRIAL RELEASE<br><br>Date: October 9, 2020<br>Time: 10:00 a.m.<br>Location: Hon. Stanley A. Boone |

Summary of Argument

Detention at the Initial Appearance would be inappropriate for several reasons. First, because further investigation is needed, the facts underlying the alleged violation of PreTrial Release conditions are unlikely to be addressed at the Initial Appearance. Secondly, however the facts are ultimately determined, Mr. Patterson's behavior on Saturday, September 19, did not involve economic crimes such as those alleged in the Indictment, nor does that behavior indicate an increased flight risk. There is also a mitigating circumstance; a few days before the alleged violation, on Wednesday, September 16, Mr. Patterson's best friend was killed in a head-on traffic collision. Under these circumstances, detention is not an appropriate response although a lesser sanction(s) may eventually be found appropriate.

1

PreTrial detention is also inappropriate because Mr. Patterson suffers from numerous serious health issues. He recently underwent bariatric surgery and to maintain his health, follows a comprehensive diet routine and receives injections twice a week. He also depends on a C-PAP machine. COVID-19 remains prevalent in the Fresno County Jail and Mr. Patterson's health issues – particularly obesity, diabetes, and high blood pressure - put him at a high risk of severe complications or death if he becomes infected with that disease.

## ARGUMENT

A.  Statutory Analysis

The Bail Reform Act, at 18 U.S.C. §3148 (a), provides that a person who has violated a condition of release, is subject to a revocation of release, an order of detention, and a prosecution for contempt of court. The statute further provides that,

" … the judicial officer shall enter an order of revocation and detention if, after a hearing, the judicial officer—

(1) finds that there is—

(A) probable cause to believe that the person has committed a Federal, State, or local crime while on release; or

(B) clear and convincing evidence that the person has violated any other condition of release; and

(2) finds that—

(A) based on the factors set forth in section 3142(g) of this title, there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or

(B) the person is unlikely to abide by any condition or combination of conditions of release." *(18 U.S.C. §3148 (b))*[1]

---

[1] If the judicial officer finds that the person committed a felony offense there is a rebuttable presumption of danger. That presumption does not apply in this case.

PreTrial detention pursuant to §3148 must be based on considerations of flight or danger to another person or the community. *United State v. Howard,* 793 F.3d 1113, 1113-14 (9th Cir. 2015) (J. Kozinski concurring). The Court in *United States v. Parker,* 65 F. Supp. 3d 358, 363 (W.D.N.Y. 2014), analyzed whether there was any meaningful difference between the §3148(b)(2)(A) and (b)(2)(B) factors - respectively, considerations of flight and danger and likelihood of abiding by conditions – and concluded there was no meaningful distinction between those factors. The *Parker* Court reached that conclusion because PreTrial Release conditions are designed to address flight and danger concerns and therefore "the [§3148(b)(2)(A) and (b)(2)(B)] inquiry overlaps and arguably requires consideration of the same elements." *Id.* Put more plainly, the fact that someone violated or is unlikely to abide by a particular PreTrial Release condition(s) does not necessarily justify detention even though a lesser sanction may be appropriate. Only if the risk of flight or danger is impacted because the person is "unlikely to abide by any condition or combination of conditions of release" is detention justified.[2]

B. <u>Mr. Patterson's Conduct Should Not Result In PreTrial Detention</u>

1. <u>Flight And Danger Analysis</u>

Mr. Patterson is alleged to have violated California Vehicle Code § 20002(a) - misdemeanor hit and run. Some of Mr. Patterson's conduct did not reflect good judgement. However, that conduct does not impact Mr. Patterson's risk of non-appearance nor risk of danger to the safety of the community. Mr. Patterson is not more likely to flee from the pending charges because he failed to immediately report a non-injury traffic accident and because he was less

---

[2] An example of a situation where detention would seem to be unjustified would be a defendant who was habitually tardy in mailing in a required form but otherwise complied with all conditions of release. The habitual tardiness might be exasperating but would not justify PreTrial detention.

than candid during the initial stages of the police inquiry. Similarly, the traffic accident and its aftermath have no bearing on economic danger and this incident does not increase Mr. Patterson's risk of economic danger to the community or any individual. If the Court is concerned about Mr. Patterson's driving or alcohol use, Mr. Patterson is willing to accept whatever conditions the Court may impose.[3]

      Mr. Patterson is presumed innocent of his pending federal charges and this Court must impose the least restrictive conditions necessary to assure that he will not flee or pose a danger to the safety of any other person or the community. Many factors favor Mr. Patterson's continued release. He is a life-long Central California resident. He had some involvement with the criminal justice system from 2006 through 2009, and then maintained a clean record until the current charges. He has no history of failing to appear in Court, and in this case, he has been diligent in his Court appearances. The alleged violation took place within days – Wednesday to Saturday – of Mr. Patterson's best friend's death in a head-on traffic collision. *See,* Exhibit 1, media account of Kenneth Atkins' death as well as personal correspondence submitted under seal.

      Mr. Patterson helps support six children – ages ranging from 9-22 - and his now unemployed long-time girlfriend. The oldest child is severely disabled due to a mental handicap and lives full-time with Mr. Patterson and his girlfriend. Mr. Patterson also pays approximately $8,900/month owed on a promissory note and that payment is the major source of income for the creditor, Ms. Kelly Weaver. *See,* Exhibit 2, letter from Ms. Weaver.

///

///

---

[3] Ankle monitors that detect alcohol use are readily available.

2. <u>Health and COVID-19 Concerns</u>

Even without COVID-19, Mr. Patterson faces serious health risks if he is put in custody. On July 21, 2020, Mr. Patterson underwent bariatric surgery. *See,* Dr. Guzman report, filed under seal. Mr. Patterson has a complex nutritional and medical regimen to recover from that surgery and successfully adjust to his changed digestive system. *Id.* His C-PAP machine is vital to his health. *Id.,* prg. 1. A jail cannot provide a healthy environment for a person with these conditions.

In addition to Mr. Patterson's individual health concerns, the entire world is grappling with the COVID-19 pandemic. That pandemic is impacting the judicial and detention systems as well as every other facet of society. Within the past week, the National Commission on COVID-19 and Criminal Justice, co- chaired by former United States Attorney Generals Roberto Gonzalez and Loretta Lynch, made the following recommendation to Courts nation-wide:

"Reduce density.

Identify opportunities to reduce population density in jails and other court-related facilities, including: limiting the use of bail for individuals awaiting trial to only those who pose a significant danger to the community or substantial flight risk; reviewing and reconsidering bail decisions for individuals held pretrial who pose a minimal risk to public safety but are unable to pay their bond; and establishing criteria to review individuals near the end of their sentence in local jails for potential release or transfer to alternatives to incarceration. Also consider COVID-19 and other extenuating circumstances in limiting bench warrants or failure-to-appear warrants".  See, National Commission on COVID-19 and Criminal Justice. Recommendations for Response and Future Readiness. Washington, D.C.: Council on Criminal Justice, October 2020; https://counciloncj.foleon.com/covid19/report/courts/

///

///

COVID-19 ramifications must be included in this Court's analysis in this case. Putting anyone in custody carries health risks – primarily to the person held in custody but also to the community impacted by detainees' need for health care resources and the risk to correctional staff and everyone who interacts with the staff.

Due to his health issues, Mr. Patterson has significant risks for complications from COVID-19 if he is infected. Most significantly, he is obese and suffers from diabetes mellitus and high blood pressure, all conditions documented to increase the risk of complications from COVID-19.  The Center for Disease Control's most recent publication regarding COVID-19 and medical conditions confirms that individuals, such as Mr. Patterson, who are obese or suffer from Type 2 diabetes mellitus[4] are at increased risk of severe illness from COVID-19 and also indicates that individuals suffering from high blood pressure might be at increased risk. *See,* Exh. 3, CDC Coronavirus Disease 29019 (COVID-19) People With Certain Medical Conditions, September 11, 2020. The CDC warning regarding obesity referenced a BMI of 30 or higher.  Mr. Patterson, 5'10" and 300 lbs, has a BMI of 43. *See,* Exh. 4, counsel's declaration.

The Fresno County Jail has particular difficulty containing COVID-19. As of late August 2020, it was reported that the Fresno Jail had the 12th largest cluster of cases — including both inmates and staff —at any single facility in the United States. *See,* Exh. 5, Valley Public Radio article, *Why A Massive COVID-19 Outbreak At Fresno County's Jail Flew Under The Radar*, Kerry Klein, Alex Hal & Julie Small, August 27, 2020. On September 29, 2020, undersigned counsel was appointed to represent a federal defendant who had been arrested on September 28 and held in the Fresno County Jail.  Even before that defendant's September 29 Initial

---

[4] Type 2 diabetes begins during adulthood while Type 1 was formerly known as juvenile onset diabetes.

6

Appearance could take took place, he was exposed to COVID-19 at the Fresno County Jail and placed in quarantine. *See,* Exh. 4, Declaration of counsel.

Custodial facilities are inherently susceptible to infectious disease outbreaks. All incarceration poses a grave public health threat during this pandemic. "COVID-19 poses a serious risk to inmates and workers in detention facilities." *See,* Exh. 6, Beyrer Dec. ¶ 11. It is well-known in the epidemiological community that such facilities are "associated with high transmission probabilities for infectious diseases." Beyrer Dec. ¶ 11; *see also* Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910; Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf. Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases. *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY.

When outbreaks occur in custodial facilities, those illnesses lead directly to increased spread beyond those institutions. *See* Beyrer Dec. ¶ 12. "It is therefore an urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible." Beyrer Dec. ¶ 17. "Infections that are transmitted through droplets, like influenza and SARS-nCoV-2 virus, are particularly difficult to control in detention facilities." Beyrer Dec. ¶ 13. Social distancing and decontaminating surfaces is "virtually impossible." *Id.* Furthermore, "[t]he high rate of turnover and population mixing of staff and detainees increases likelihoods of exposure." *Id.*

As noted earlier, Mr. Patterson has significant individual risks for complications from COVID-19 if he is infected. Most significantly, he is obese and suffers from diabetes mellitus and high blood pressure, all conditions documented to increase the risk of complications from COVID-19.

COVID-19's death rate goes up 1) the older you are and 2) the sicker you are. The death rate increases *dramatically* with age. Evidence from the early stages of the pandemic indicated that is that people aged 10-39 years stood a roughly 0.2% chance to die from COVID-19 (still a mortality rate double the influenza mortality rate). Then the death rate started going up with age:

| Age | Case Fatality Rate |
|---|---|
| 40-49 years old | 0.4% |
| 50-59 years old | 1.3% |
| 60-69 years old | 3.6% |
| 70-79 years old | 8% |
| 80+ years old | 14.8%[5] |

COVID-19 also kills the sick. *See* Beyrer Dec. ¶ 6. COVID-19's comorbidity death rate is frightening. Across all age groups, COVID-19 killed:

| Condition | Case Fatality Rate |
|---|---|
| Cardiovascular disease | 13.2% |
| Diabetes | 9.2% |
| Hypertension | 8.4% |

---

[5] This information derived from analysis of deaths in Hubei Province, China. This information was obtained by undersigned counsel from filings in the Western District of Washington. Counsel believes the U.S. fatality rate is much lower than that suffered in Wuhan. However, the increased risks due to age and medical condition remain significant and undersigned counsel believes the Wuhan data illustrates that fact.

8

| | |
|---|---|
| Chronic respiratory disease | 8% |
| Cancer | 7.6%[6] |

In Wuhan, of the hospitalized population who ended up dying from COVID-19, 48% of them had hypertension, 31% had diabetes, and 24% had coronary heart disease. *See* Fei Zhou et al., *Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective cohort study*, Lancet (Mar. 11, 2020), *available at* https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext.

For these reasons, the best epidemiological advice to deal with this national health emergency is that "[o]lder inmates and those with chronic conditions predisposing to severe COVID-19 disease . . . should be considered for release." Beyrer Dec. ¶ 18.

The stark reality is that Mr. Patterson faces real and significant threats to his health and life if incarcerated at this time.

///

///

---

[6] *See* World Health Organization, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)* at 12 (Feb. 28, 2020), *available at* https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf; *see also* Wei-jie Guan et al., *Comorbidity and its impact on 1,590 patients with COVID-19 in China: A Nationwide Analysis*, medRxiv at 5 (Feb. 27, 2020), https://www.medrxiv.org/content/10.1101/2020.02.25.20027664v1.full.pdf (finding that even after adjusting for age and smoking status, patients with COVID-19 and comorbidities of chronic obstructive pulmonary disease, diabetes, hypertension, and malignancy were 1.79 times more likely to be admitted to an ICU, require invasive ventilation, or die, and the number for two comorbidities was 2.59).

### 3. Due Process/COVID-19 Concerns

PreTrial detention imposes an extraordinary burden on a defendant at this time. In this district, the Speedy Trial Act has been suspended until June 15, 2021. *See,* EDCA General Orders 617, 611.  A detained defendant will inevitably spend months in custody. Communication with counsel will be severely impacted by the constraints of custody and COVID-19 concerns. The Court must include due process concerns in weighing detention as opposed to alternative conditions of release.

### Conclusion

The alleged violation does not create an increased risk of flight nor danger to the community, and consequently, a sanction other than detention would be appropriate. Beyond the statutory analysis requiring assessment of flight and danger, Mr. Patterson has serious health conditions and COVID-19 has radically impacted the factors which this Court must take into account when considering detention. Given Mr. Patterson's health, detention is not simply a curtailment of his liberty but imposes significant, life-threatening risks. Detention is not appropriate at this time.

Dated:  October 5, 2020                                   Respectfully submitted,

                                                                /s Kevin Rooney
                                                  KEVIN P. ROONEY
                                                  Attorney for defendant
                                                  KENNETH S. PATTERSON