# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| v. | ) ) | Crim. Action No. 17-0201-01 (ABJ) |
| PAUL J. MANAFORT, JR. | ) ) ) | |
| Defendant. | ) ) | |

## ORDER OF DETENTION

On May 10, 2018, defendant filed a motion for reconsideration of the conditions of his release pending trial, Def.'s Mot. for Recons. of Conditions of Release [Dkt. # 292] ("Def.'s Recons. Mot."), and on June 4, 2018, the government filed its motion to revoke defendant's current order of pretrial release.  Gov't Mot. to Revoke or Revise Def.'s Current Order of Pretrial Release [Dkt. # 315] ("Gov't Mot. to Revoke").  Both motions have been fully briefed, *see* Gov't Resp. to Def.'s Recons. Mot. [Dkt. # 304]; Def.'s Opp. to Gov't Mot. to Revoke [Dkt. # 319] ("Def.'s Opp."); Gov't Reply in Supp. of Gov't Mot. to Revoke [Dkt. # 322] ("Gov't Reply"), and the Court held a hearing on both motions on June 15, 2018.[1]  Based upon consideration of the entire record, and for the reasons stated in detail at the hearing, the government's motion was granted. The Court also denied defendant's motion to stay the order of detention pending appeal.  Since the Bail Reform Act requires that the grounds for any order of detention be set forth in writing, 18 U.S.C. § 3142(i), the Court will summarize the basis for its order below.

---

1   At the hearing, both the prosecution and the defense rested solely on the record, declining to present witnesses in support of their positions on the motions.

1

**PROCEDURAL HISTORY**

On October 30, 2017, defendant was arrested and he appeared before a Magistrate Judge. He was released to the Pretrial Services Agency's High Intensity Supervision Program with an order of permanent home confinement with GPS monitoring, and he signed an unsecured appearance bond in the amount of $10,000,000.00. Order [Dkt. # 9]; Min. Entry (Oct. 30, 2017). He was permitted to attend meetings with his counsel, court appearances, religious services, and medical appointments, and he was warned in writing on the release form: "YOU ARE NOT TO COMMIT ANY CRIMINAL OFFENSE." Order [Dkt. # 9].

Defendant sought relief from those conditions and on November 6, 2017, for the reasons set forth on the record, this Court ruled pursuant to 18 U.S.C. §3142(b) that release on personal recognizance with an unsecured appearance bond, and without GPS monitoring, would not reasonably assure the appearance of the defendant, and that additional conditions were required. Nov. 6, 2017 Tr. [Dkt. # 37].  The safety of the community was not deemed to be a concern at that time.  *Id.*  The Court announced that in order to be relieved of the condition of home confinement, the defendant would be required to supply either security for the $10 million bond under section 3142(c)(1)(B)(xi) of the Bail Reform Act – that is, property with sufficient unencumbered value to cover the bond, or a surety under subsection (xii), which requires the identification of a person with net worth of sufficient unencumbered value to pay the amount of the bail bond.  For a series of reasons that do not bear directly on the order of detention, but that were reviewed during the hearing and are a part of the record, defendant has not yet been relieved of the condition of home detention.

Meanwhile, on November 8, 2017, the Court – with the consent of all of the parties – entered a media communication order in the case. Order [Dkt. # 38]. On November 30, 2017, the defendant submitted a more specific bond proposal, Def.'s Mot. to Modify Conditions of Release

2

[Dkt. # 66], but in response, the prosecution informed the Court of a potential violation of the media communication order involving alleged communication by the defendant with a Russian national regarding the publication of a favorable op-ed piece, which the defendant had edited, on a website in Kiev.  *See* Gov't Opp. to Def.'s Mot. to Modify Conditions of Release [Dkt. # 73]; Decl. in Supp. of Gov't Opp. to Def.'s Mot. to Modify Conditions of Release [Dkt. # 76].  The Court issued an order on December 5, 2017 for defendant to show cause why its order had not been violated.  Min. Order (Dec. 5, 2017). At a status hearing on December 11, 2017, the Court discharged the order to show cause, but admonished the defendant:

> I do want all the defendants, all of the parties to understand that I am likely to view similar conduct in the future to be an effort to circumvent and evade the requirements of my order as they have been clarified this morning. And I do believe it's fair to consider the facts that I was provided with, like all facts, in connection with my consideration of the bond issue.

Dec. 11, 2017 Tr. [Dkt. # 112] at 12.

After a series of pleadings and hearings over a period of approximately six months related to the generation of an acceptable bond package, *see* Def.'s Mot. to Modify Conditions of Release [Dkt. # 66] (Nov. 30, 2017 proposal of conditions of release that both sides agreed upon); Order [Dkt. # 95] (Dec. 15, 2017 order *granting* the agreed proposal, and ordering defendant to notify the Court once all of the necessary documents had been executed); Min. Entry (Jan. 16, 2018); Jan. 16, 2018 Tr. [Dkt. # 151]; Def.'s Renewed Mot. for Recons. of Conditions of Release [Dkt. # 230] (March 13, 2018 motion proposing a *different* arrangement); Order [Dkt. # 260] (April 9, 2018 order denying March 13 motion without prejudice and setting out exactly which properties would be acceptable for a bond package).

The defendant filed another motion for reduction of bond on May 10, 2018.  Def.'s Recons. Mot.  The financial details were largely acceptable to the prosecution, *see* Gov't Resp. to Def.'s Recons. Mot., but on May 25, 2018, the Office of Special Counsel advised the Court that it had

3

additional information it planned to present to the Court, and it sought until June 4, 2018 to do so. Gov't Mot. for Leave to File a Suppl. Resp. to Def.'s Recons. Mot. [Dkt. # 308 EX PARTE SEALED] [Dkt. # 325 PUBLIC].[2] The Court granted the government's request, Min. Order (May 31, 2018), and on June 4, the government filed its motion to revoke the defendant's release, alleging that the defendant had committed the felony offense of tampering with a witness in violation of 18 U.S.C. § 1512 while he was on release. Gov't Mot. to Revoke.

Subsequently, on June 8, 2018, the grand jury returned a superseding indictment [Dkt. # 318], charging the defendant and a new co-conspirator, Konstantin Kilimnik, with obstruction of justice and conspiracy to obstruct justice in addition to the charges that were already pending.

## FACTUAL BACKGROUND

The allegations that prompted the government's motion arise out of the superseding indictment filed in this case on February 23, 2018. Superseding Indictment [Dkt. # 202]. That indictment included new charges arising out of the allegations that the defendant had served as an unregistered agent of a foreign government and of foreign political parties, specifically, the Government of Ukraine, the President of Ukraine (Victor Yanukovych), who was President from 2010 to 2014, the Party of Regions (a Ukrainian political party led by Yanukovych), and the Opposition Bloc (a successor to the Party of Regions after Yanukovych fled to Russia in 2014.). *Id.* ¶1. The superseding indictment included the new allegations that as part of that ongoing effort, the defendant engaged other firms to lobby on behalf of his Ukrainian clients, and that he secretly retained a group of former senior European politicians, referred to as the "Hapsburg Group," to take positions favorable to Ukraine – ostensibly independently, but in fact, as paid lobbyists. The

---

2   The motion was originally filed ex parte and under seal. A public version of the sealed filing was entered on the docket on June 13, 2018.

4

superseding indictment alleged that some of this lobbying took place not just in Europe, but in the United States. *Id*. ¶¶ 29–30. On the date the superseding indictment was returned, the co-defendant in the original indictment, Richard W. Gates III, entered a plea of guilty to conspiring with the defendant and to making a false statement. Plea Agreement [Dkt. # 205].

The material submitted in support of the motion to revoke the defendant's bond alleges that the following events occurred immediately thereafter:

| Date | Dkt. # / Document | Caller / Sender | Recipient | Event |
|---|---|---|---|---|
| Oct. 27, 2017 | Dkt. # 13 Indictment | N/A | N/A | Indictment of Paul J. Manafort, Jr. and Richard W. Gates III |
| Feb. 13, 2018 | *US v. Manafort*, 18-cr-00083 (TSE) ("E.D. Va. Case") Dkt. # 1 Indictment | N/A | N/A | E.D. Va. Indictment of Paul J. Manafort, Jr. |
| Feb. 22, 2018 | E.D. Va. Dkt. # 9 Superseding Indictment | N/A | N/A | E.D. Va. Superseding Indictment of Paul J. Manafort, Jr. |
| Feb. 23, 2018 | Dkt. # 202 Superseding Indictment | N/A | N/A | Superseding Indictment of Paul J. Manafort, Jr. |
| Feb. 23, 2018 | Dkt. # 205 | N/A | N/A | Richard Gates pleads guilty. |
| Feb. 24, 2018 3:51 P.M. (UTC)[3] | Dkt. # 315-2 Decl. of B. Domin ("FBI Aff.") ¶ 14, Ex. N | Manafort | Person D1 | Manafort calls D1[4] on D1's cell phone after superseding indictment is publicly disclosed. Call lasts 1 minute 24 seconds.[5] |

---

[3] All references to time come from Ex. N to Gov't Mot. to Revoke [Dkt. # 315-16] ("Ex. N"). UTC stands for Coordinated Universal Time and CEST stands for Central European Summer Time.

[4] D1 and D2 are identified in the agent's affidavit as principals of the media relations firm that acted as the intermediary with the Hapsburg Group. FBI Aff. ¶ 3.

[5] Counsel for the government proffered at the hearing that counsel for D1 had advised the United States that defendant called D1 and reached him on his cell phone. Defendant told D1 that he needed to give D1 a "heads up" about Hapsburg, and D1 ended the call before Manafort was able to discuss anything further.

5

| Date | Dkt. # / Document | Caller / Sender | Recipient | Event |
|---|---|---|---|---|
| Feb. 24, 2018 3:53 P.M. (UTC) | FBI Aff. ¶ 14, Ex. N | Manafort | Person D1 | Manafort texts D1 using WhatsApp (encrypted). Message: "This is paul." |
| Feb. 25, 2018 6:41 P.M. (UTC) | FBI Aff. ¶ 14, Ex. N | Manafort | Person D1 | Manafort attempts to call D1 using phone (not encrypted), but phone call does not connect. |
| Feb 26, 2018 11:56 P.M. (UTC) | FBI Aff. ¶ 15 Dkt. # 315-15 (Ex. M) Article | Manafort | Person D1 | Manafort sends D1 a message (encrypted): "http://www.businessinsider.com/former-european-leaders-manafort-hapsburggroup-2018-2?r=UK&IR=T" |
| Feb. 26, 2018 11:57 P.M. (UTC) | FBI Aff. ¶ 15, Ex. N | Manafort | Person D1 | Manafort texts D1 (encrypted). "23:57: We should talk. I have made clear that they worked in Europe." |
| Feb. 27, 2018 11:03 A.M. (UTC) | FBI Aff. ¶ 15, Ex. N | Manafort | Person D1 | Manafort attempts to call D1 using WhatsApp (encrypted). |
| Feb. 27, 2018 11:31 A.M. (UTC) | FBI Aff. ¶ 14, Ex. N | Manafort | Person D1 | Manafort attempts to call D1 using phone (not encrypted), but phone call does not connect. |
| Feb. 28, 2018 | FBI Aff. ¶ 17, Ex. N | Person A | Person D2 | Person A attempts to contact D2 through WhatsApp (encrypted). **Person A sends four messages**: |
| Feb. 28, 2018 1:49 A.M. (CEST) | FBI Aff. ¶ 17, Ex. N | Person A | Person D2 | Message 1 (encrypted): "[Person D2], hi! How are you? Hope you are doing fine. ;))" |
| Feb. 28, 2018 1:51 A.M. (CEST) | FBI Aff. ¶ 17, Ex. N | Person A | Person D2 | Message 2 (encrypted): "My friend P is trying to reach [Person D1] to brief him on what's going on." |
| Feb. 28, 2018 1:51 A.M. (CEST) | FBI Aff. ¶ 17, Ex. N | Person A | Person D2 | Message 3 (encrypted): "If you have a chance to mention this to [Person D1] - would be great." |

6

| Date | Dkt. # / Document | Caller / Sender | Recipient | Event |
|---|---|---|---|---|
| Feb. 28, 2018 1:53 A.M. (CEST) | FBI Aff. ¶ 17, Ex. N | Person A | Person D2 | Message 4 (encrypted): "Basically P wants to give him a quick summary that he says to everybody (which is true) that our friends never lobbied in the US, and the purpose of the program was EU" |
| Feb. 28, 2018 | FBI Aff. ¶ 17, Ex. N | Person A | Person D2 | Person A switches to Telegram, a different encrypted messaging application. **Person A sends five similar messages** to D2. According to the government's Exhibit N, these messages stated: |
| Feb. 28, 2018 6:01 A.M. (CEST) | FBI Aff. ¶ 17, Ex. N | Person A | Person D2 | Message 1 (encrypted): "Hey, how are you? This is [Person A]." |
| Feb. 28, 2018 6:01 A.M. (CEST) | FBI Aff. ¶ 17, Ex. N | Person A | Person D2 | Message 2 (encrypted): "Hope you are doing fine." |
| Feb. 28, 2018 6:01 A.M. (CEST) | FBI Aff. ¶ 17, Ex. N | Person A | Person D2 | Message 3 (encrypted): "My friend P is trying to reach [D1] to brief him on what's going on." |
| Feb. 28, 2018 6:02 A.M. (CEST) | FBI Aff. ¶ 17, Ex. N | Person A | Person D2 | Message 4 (encrypted): "Basically P wants to give him a quick summary that he says to everybody (which is true) that our friends never lobbied in the US, and the purpose of the program was the EU." |
| Feb. 28, 2018 6:03 A.M. (CEST) | FBI Aff. ¶ 17, Ex. N | Person A | Person D2 | Message 5 (encrypted): "If you have a chance to mention this to [Person D1]. - it would be great. It would be good to get them connected to discuss in person. P is his friend." |

7

| Date | Dkt. # / Document | Caller / Sender | Recipient | Event |
|---|---|---|---|---|
| Mar. 9, 2018 | E.D. Va. Dkt. # 25 Order | | | The United States District Court for the Eastern District of Virginia entered an order in defendant's pending case there that provided, inter alia, that defendant "must avoid all contact, directly or indirectly, with any person who is a victim or witness in the investigation or prosecution of the defendant." |
| Apr. 4, 2018 | FBI Aff. ¶ 18, Ex. N | Person A | Person D2 | Person A texts D2 through two different encrypted messaging applications: **Person A texts D2 three times:** |
| Apr. 4, 2018 8:53 A.M. (CEST) | FBI Aff. ¶ 18, Ex. N | Person A | Person D2 | Message 1 (encrypted, WhatsApp): "Hey. This is [Person A]. My friend P asked me again to help connect him with [Person D1]. Can you help?" |
| Apr. 4, 2018 8:54 A.M. (CEST) | FBI Aff. ¶ 18, Ex. N | Person A | Person D2 | Message 2 (encrypted, Telegram): "Hey. My friend P has asked me again if there is any way to help connect him through [Person D1]" |
| Apr. 4, 2018 8:54 A.M. (CEST) | FBI Aff. ¶ 18, Ex. N | Person A | Person D2 | Message 3 (encrypted, Telegram): "I tried him [Person D1] on all numbers." |
| Apr. 4, 2018 1:00 P.M. (UTC) | FBI Aff. ¶ 18, Ex. N | Person A | Person D1 | Person A texts (encrypted) D1. Message: "Hi. This is [Person A's first initial]. My friend P is looking for ways to connect to you to pass you several messages. Can we arrange that." |
| Jun. 8, 2018 | Dkt. # 318 | N/A | N/A | Superseding Indictment of Paul J. Manafort, Jr. and Konstantin Kilimnik |

8

**THE PARTIES' CHARACTERIZATIONS OF THE FACTS**

The Office of Special Counsel maintains that the conduct alleged in the indictment adds up to an unlawful five-week campaign to obstruct justice and influence the testimony of a witness that was undertaken while the defendant was on pretrial release in this case.

The defendant disputes the government's characterization of the contacts. First, Manafort takes issue with the notion that he knew that D1 and D2 were "witnesses" when he "reached out," since the defense had not received a definitive witness list by that point.[6] He also questions whether the government had even identified the two as witnesses as of the dates of the contacts. He emphasizes that in any event, he was not under an order issued by *this* Court to avoid contact with witnesses.

More fundamentally, defendant maintains that the contacts do not give rise to an inference that he was advancing a false narrative, because, in fact, the Hapsburg Group's work was confined to Europe and did not involve the United States. In support of that contention, he provides a document, a memorandum describing a July 12, 2012 "Kick off Meeting" of the Hapsburg group that lays out planned work to be done only within the European Union. Ex. A to Def.'s Opp. [Dkt. #319-1]; *see also* Ex. C to Gov't Mot. to Revoke [Dkt. # 315-5] (memorandum from D1 concerning the Hapsburg Group with a European focus). However, the government submitted a series of documents that refer to efforts to be undertaken by the media relations firm within both Europe and the United States, and documents related to plans to introduce at least one Hapsburg Group member to at least one Member of Congress, as well as a document from D2 to D1 describing such a meeting. *See* Ex. 1 to Gov't Reply [Dkt. # 322-1]. The government also attached

---

[6] Given the timing and the nature of the communications, this suggestion strains credulity and does little to undermine the government's showing.

9

to its reply a memorandum from the defendant to "VFY" entitled "Quarterly Report," that updates the recipient on efforts made in connection with the "strategy" in the first quarter of 2013 "to heavily engage with the USG and US Congress." Ex. 2 to Gov't Reply [Dkt. # 322-2]. The document includes an account of work done to "organize[]" and "leverage[]" the visits of Hapsburg Group members to the United States to "make critical in-roads in how policymakers view Ukraine," and it mentions op-ed pieces by Hapsburg Group members placed in U.S. publications as part of "our media outreach and strategy." *Id.*

The defendant also underscores the fact that the overwhelming majority of the contacts that were described in the affidavit in support of the government's motion did not actually establish contact: most were unanswered calls and texts. He points out that of the few that did get through, most said little of substance – P is trying to contact D1 – and that only a few specifically mentioned the location of the Hapsburg Group's work. He also notes that most of the attempts to communicate were alleged to have been made by Kilimnik and not Manafort himself. For all of those reasons, the defense questions the prosecutors' ability to make out elements of the offense.

## FINDINGS

Section 3148 of the Bail Reform Act provides that

> a person charged with violating the condition of release that such person not commit a Federal, State, or local crime during the period of release, shall be brought before the judicial officer who ordered the release and whose order is alleged to have been violated. The judicial officer shall enter an order of revocation and detention if, after a hearing, the judicial officer –
>
> (1) finds that there is –
>
>    (A) probable cause to believe that the person has committed a Federal, State, or local crime while on release; . . . [and]
>
> (2) finds that—

10

>   (A) based on the factors set forth in section 3142(g) of this title, there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or
>
>   (B) the person is unlikely to abide by any condition or combination of conditions of release."

18 U.S.C § 3148(b).  The statute goes on to provide:

> If there is probable cause to believe that, while on release, the person committed a Federal, State, or local felony, a rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community. If the judicial officer finds that there are conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community, *and that the person will abide by such conditions*, the judicial officer shall treat the person in accordance with the provisions of section 3142 of this title and may amend the conditions of release accordingly.

18 U.S.C. §3148(b) (emphasis added).

In light of the superseding indictment, the Court does not need to engage in an independent assessment of the weight of the evidence; there has been a finding of probable cause to believe that the defendant committed a felony offense[7] while he was on pretrial release in this case.

Pursuant to section 3148(b), this probable cause finding gives rise to a rebuttable presumption that no condition or combination of conditions will assure that the defendant will not pose a danger to the safety of any other person or the community.

This is true even if the felony is a non-violent felony – the statute does not specify that violence or any other factor must be present.  While there is no D.C. Circuit opinion that addresses the issue directly, other courts have not hesitated to interpret the statute in that manner.  In *United*

---

7   A violation of 18 U.S.C. § 1512 is punishable by a fine or up to twenty years' imprisonment or both, and the penalty for a conviction of conspiracy to commit an offense under that provision is the same.  18 U.S.C, § 1512(b), (k).

11

*States v. LaFontaine*, 210 F.3d 125 (2d Cir. 2000), which appears to be the precedent that is the most similar to the case at hand, a defendant in a white collar case – who had no prior history of violence – coached a witness by reminding her what to say, but did not threaten or intimidate her. The district court's decision to revoke the defendant's bond was upheld on appeal: "[a]lthough witness tampering that is accomplished by means of violence may seem more egregious, the harm to the integrity of the trial is the same no matter which form the tampering takes." *Id.* at 135. Therefore, the Second Circuit found that even non-threatening witness tampering was sufficiently dangerous to the community to support an order of revocation. *Id.* Also, in *United States v. Bartok*, 472 Fed. Appx. 25 (2d Cir. 2012), the Second Circuit upheld the district court's order of bond revocation based on the defendant's committing perjury: "the law plainly states that the [rebuttable] presumption may be triggered by a probable cause finding as to a defendant's commission of *any* felony, regardless of whether the felony itself involves violence, threats, or other indicia of dangerousness." 472 Fed. Appx. at 29–30 (emphasis in original).

Other circuit court opinions have included similar observations.

- *United States v. Mustachio*, 254 Fed. Appx. 853, 854 (2d Cir. 2007) (where "the post-release criminal conduct . . . involved obstruction of justice through intended destruction of evidence and deceit on the court, defendants can hardly claim that conclusory denials of any intent to jeopardize the safety of others sufficed to refute the presumption in favor of detention").

- *United States v. Mackie*, No. 94-30720, 1995 WL 29300, at *2 (5th Cir. Jan. 13, 1995) (upholding bond revocation where there was probable cause to believe that the defendant induced travel as part of a fraud scheme, a non-violent offense, while on release).

- *United States v. Aron*, 904 F.2d 221, 222–23 (5th Cir. 1990): the witness testified that he felt intimidated by the defendant's visit to his home while the defendant was on release, but the defendant did not threaten him or use violence. The Court of Appeals upheld the trial court's decision to revoke the defendant's bond.

*But see United States v. Gotti,* 794 F.2d 773, 778 (2d Cir. 1986) (revocation based on actual threats to a witness).

District courts, including courts in this district, have applied these principles.

- In *United States v. McDonald*, 238 F. Supp. 2d 182, 186–88 (D.D.C. 2002), the court held that defendants involved in long-term drug dealing should be detained pending trial, even though drug dealing does not impose significant physical danger on the community. While those facts are not particularly apposite, but court did state: "[f]or the purposes of the Bail Reform Act, 'dangerous' does not mean violent: . . . The Committee [on the Judiciary] intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence."

- Similarly, in *United States v. McKethan*, 602 F. Supp. 719, 720–22 (D.D.C. 1985), the defendant's bond was revoked based on the rebuttable presumption (and the defendant's failure to rebut it) when he was arrested for possession of heroin, a non-violent crime, while on pretrial release.

- In *United States v. Gilley*, 771 F. Supp. 2d 1301, 1306 (M.D. Ala. 2011), the district court upheld a magistrate judge's revocation of bond due based on a finding of probable cause to believe that the defendant committed witness tampering by bribing a witness to testify falsely. The court found that pretrial detention was appropriate because any kind of witness tampering affects the "integrity" of the court and invokes the "public concern" of encouraging individuals to serve as witnesses. *Id.* at 1308.

Therefore, the burden has shifted to the defendant to come forward with some evidence to rebut the presumption that he poses a danger to the community.

The D.C. Circuit has not spoken to how the presumption operates in the context of section 3148, but other circuits have found the rebuttable presumption provision in section 3148 to be similar to the one in section 3142(e) that applies during the initial bond determination, and they have held that the section 3148 presumption should be applied in the same manner. *See United States v. Cook,* 880 F.2d 1158, 1162 (10th Cir. 1989). This Court will follow that approach.

Under 18 U.S.C. §3142(e)(3)(B), once a rebuttable presumption has been triggered, "the presumption operate[s] *at a minimum* to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985) (emphasis in original); s*ee also United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (the presumptions in § 3142(e) "are 'rebutted' when the defendant meets a 'burden of production' by coming forward with some evidence that he will not flee or endanger

13

the community if released"), quoting *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986); *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991) ("[A] defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption."), citing *United States v. Matir*, 782 F.2d 1141, 1144 (2d Cir. 1986). While the burden of production may not be heavy, *see United States v. Stricklin*, 932 F.2d 1353, 1355 (10th Cir. 1991), the applicable cases all speak in terms of a defendant's obligation to introduce "evidence."

And, as the court explained in *United States v. Ali*, 793 F. Supp. 2d 386 (D.D.C. 2011), even if the defendant offers evidence to counter the presumption, the presumption does not disappear entirely:

> At oral argument, defendant's counsel posited that the rebuttable presumption functions as a "bursting bubble" that ceases to exist once a defendant produces any credible evidence. Although the D.C. Circuit has not expressly ruled on this issue, circuits that have considered the issue require using the presumption as a factor even after the defendant has produced credible evidence as do judges of this Court.

*Id.* at 388 n.2 (internal citations omitted), citing *United States v. Bess*, 678 F. Supp. 929, 934 (D.D.C. 1988) ("[The presumption] is incorporated into the § 3142(g) factors considered by the court when determining whether conditions of release can be fashioned or whether the defendant must be detained pretrial."); *see also United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) ("Even when a defendant satisfies his burden of production, however, 'the presumption favoring detention does not disappear entirely but remains a factor to be considered among those weighed by the district court.'"), quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001); *Portes*, 786 F.2d at 764 ("[U]se of [the word rebutted] in this context is somewhat misleading because the rebutted presumption is not erased. Instead, it remains in the case as an evidentiary finding militating against release, to be weighted along with other evidence relevant to factors listed in § 3142(g)."), quoting *Dominguez*, 783 F.2d at 707.

As the U.S. Court of Appeals for the Sixth Circuit has explained:

> The presumption remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial. To rebut the presumption, therefore, a defendant should "present all the special features of his case" that take it outside "the congressional paradigm."

*Stone*, 608 F.3d at 945–46 (internal citations omitted), quoting *United States v. Jessup*, 757 F.2d 378, 387 (1st Cir. 1985).

Following this guidance, the Court notes that while the defendant's presentation consisted largely of argument, he did submit several exhibits in connection with his opposition to the bond review motion. And at the hearing, counsel for the defendant pointed to other factual circumstances, in particular the fact that the defendant was "generally in compliance" with the stringent requirements of his release, including the somewhat onerous obligations imposed by the duplication of GPS monitoring systems and reporting requirements that arose out of his indictment in two jurisdictions. Therefore, given the relatively low threshold for what the defendant must do at this stage, the Court finds that he came forward with some evidence to rebut the presumption.

But it was not a very substantial showing, and it was largely directed towards the question of whether the defendant committed the charged offense, and not whether he posed a danger to the community or he could be trusted to abide by the Court's orders.

In any event, while the presumption operates to shift the burden of production, it does not alter the government's statutory burden of persuasion, which is consistent with the presumption of innocence. *Portes*, 786 F.2d at 764. "Regardless of whether the presumption applies, the government's ultimate burden is to prove that no conditions of release can assure that the defendant will appear and to assure the safety of the community." *Stone*, 608 F.3d at 946.

The Court is well aware of the directive that appears in section 3148 – the section of the statute that addresses violations of release condtions – that "if the judical officer finds that there are conditions of release that will assure that the person will not flee or pose a danger," and "that the person will abide by such conditions," the judicial officer "shall" treat the person in accordance with the provisions of section 3142. 18 U.S.C. §3148(b)(2)(B). Those provisions require that the judge "shall" order the pretrial release of a person "subject to the least restrictive further condition, or combination of conditions that . . . will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. §3142(c)(1)(B). And the law is clear that the Court may not detain the defendant to punish him for the as-yet-unproven allegations of witness tampering.[8]

Here, while the defendant is now subject to additional penalties as a result of the superseding indictment, and the allegations reveal troubling continuing contacts with individuals abroad, it is not of the view that there has been any change in the defendant's risk of flight that warrants detention. The additional charges do not change the calculus much given what the defendant was already facing if he was convicted.

But with respect to the question of whether the defendant poses a danger to the community, the problem for the defendant is two-fold: there is a presumption that has only barely been rebutted that he is a danger, and even if there were appropriate conditions the Court could craft, it finds

---

8   The Court noted at the hearing that now that the government has elected to bring formal charges arising out of these allegations, the defendant will be tried for those allegations in just three months' time, and that if he is convicted, the Court will have the opportunity to vindicate the community's interests by imposing a sanction at that time. But the Court is still faced with the obligation of protecting the community and the administration of justice in the meantime.

itself unable to make the statutorily necessary finding that he will abide by those conditions between now and the trial date.

It is true that the statute speaks of a need for detention to ensure that no harm befalls any person or the community, and that no harm to any *person* has been alleged. While the grand jury has found probable cause to believe the defendant has attempted to corruptly persuade people to lie, the record contains no evidence of even a *threat* of harm to any person.

The case involves an alleged threat of harm "to the community." And it does not present what one might consider to be the most typical varieties of harm to the community at large, such as dangerous substances being peddled on the street, or the unlawful possession of firearms.

Instead, the feared harm that was specified in the pleadings in this case is abstract: harm to the administration of justice; harm to the integrity of the courts. But those dangers are entitled to the full protection of the Bail Reform Act. The superseding indictment alleges a corrupt attempt to undermine the integrity and truth of the fact-finding process upon which our system of justice depends. And the prosecution argued quite persuasively at the hearing that the danger is broader than that: it is a danger that the defendant will commit another crime of any nature while he is on release.

This raises the question: what condition or combination of conditions could the Court impose to guard against that possibility? It would be entirely impractical and ineffective to demand the surrender of his cell phone or to disconnect his internet service at home. Not only would this require a level of monitoring by the Pretrial Services Agency in the Eastern District of Virginia that it is not in a position to carry out, but it would be impossible to enforce. Defendant lives with another person, he is permitted to have visitors, and he spends a considerable portion of his time at his lawyers' offices.

And the defense did little to inspire the Court's confidence when it insisted at the hearing that the defendant complied with the Court's requirements – when they were "abundantly clear," or when they were "clear and unambiguous."  In the Court's view, the broad prohibition contained in the order entered by the United States District Court for the Eastern District of Virginia on Marcy 9, 2018 is clear and unambiguous:

> Defendant must avoid all contact, directly or indirectly, with any person who is a victim or witness in the investigation or prosecution of the defendant.

*United States v. Paul J. Manafort, Jr.*, 18-cr-00083 (TSE) [Dkt. # 25] ¶ (viii).  The Court is very troubled by the evidence that the contacts allegedly made on the defendant's behalf by Kilimnik continued after the order was entered, and that multiple messages specifically attribute the re-initiation of the attempts to contact D1 to the defendant.  ("My friend P asked me again to help connect him with [Person D1].")  This Court does not have the jurisdiction to sanction a violation of another Court's order, but it may certainly consider the defendant's adherence to that Court's admonitions in determining whether it can place its trust in the defendant.

The defendant proposed only one condition that could protect the community, and that was the issuance of an order that would absolutely be clear enough for him to follow.  He emphasized that he could not possibly know which witnesses to avoid without a list provided by the United States, and his insistence on this level of specificity, on top of a standard order not to contact witnesses, or a standard order not to commit another criminal offense, simply highlights why the Court finds it necessary to conclude under section 3148(b)(2)(A) that there is no condition or combination of conditions that will suffice in this case.  As the Court observed at the conclusion of the hearing, there is a real risk that the defendant will interpret any list naming certain individuals as license to contact any other individuals involved in the investigation.  The Court

cannot draft an order that is specific enough to cover every possible future violation of the United States Code, and it should not have to.

Given the nature of the allegations in the superseding indictment and the evidence supplied in support of the government's motion, including the number of contacts and attempted contacts, the persistence of the efforts to make contact, the inferences that can be drawn from what was said, and the clear impact the statements had on the recipient, who reported them to the prosecution as an attempt to suborn perjury, FBI Aff. ¶ 19, the Court finds that the presumption has not been overcome, and that there are no conditions that would assure that the defendant will comply with the most fundamental condition of release under the Bail Reform Act: that he not commit a Federal, State, or local crime during the period of release. *See* 18 U.S.C. §3142(b).

Moreover, the Court finds that even if the defendant had offered up some additional practical conditions that could to be layered on top of the terms under which he is already operating, it could not find, as the statute requires that it must, that defendant Manafort would abide by those conditions. *See* 18 U.S.C. §3148(b). The defendant has already experienced some difficulty adhering to this Court's directives and another Court's directives, and his apparent belief that any such directives should be construed as narrowly as possible leaves the Court with the unshakeable impression that he cannot be trusted to comply in the future.

For all of these reasons, and for all of the reasons stated on the record at the hearing, the government's motion to revoke the defendant's bond has been granted, and his motion to reduce the conditions of release is denied as moot.

/s/ Amy B Jackson

AMY BERMAN JACKSON
United States District Judge

DATE: June 15, 2018