PHILLIP A. TALBERT
United States Attorney
ALEXANDRE DEMPSEY
Assistant United States Attorney
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile:  (559) 497-4099

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KENNETH SHANE PATTERSON,<br><br>Defendants. | CASE NO. 1:19-CR-00230-DAD-BAM<br><br>UNITED STATES' SENTENCING MEMORANDUM<br><br>DATE: April 18, 2022<br>TIME: 9:00 a.m.<br>COURT: Hon. Dale A. Drozd |

## I.   INTRODUCTION

Defendant Kenneth Shane Patterson is set for judgment and sentencing on April 18, 2022, for his role in multiple counts of fraud and tax evasion. As discussed in more detail below, Patterson pleaded guilty to all counts of the indictment on October 19, 2021. In light of his conduct, the sentencing guidelines, and consideration of the factors outlined in 18 U.S.C. § 3553(a), the United States hereby submits its recommendation that this Court vary upwards from the sentencing guideline range and sentence Patterson to a term of 135 months imprisonment.

## II.   FACTUAL BACKGROUND

Patterson was indicted on October 31, 2019, on six counts of wire fraud, one count of bank fraud, and one count of tax evasion. Dkt. 1. The wire fraud counts charged Patterson with implementing an investment fraud scheme to defraud H.Q. that continued from February 3, 2015 to August 8, 2017. Dkt. 1 ¶ 9. The indictment alleged that Patterson defrauded H.Q. of more than $900,000 by falsely telling her he needed the money to acquire a skilled nursing facility, which he

1 would then sell to H.Q. *Id.* ¶ 13. Patterson did not use any of the funds on the nursing facility. *Id.* at 15. Each wire count charged the interstate wire transmission of a check issued to Patterson by H.Q. or her trust. *Id.* ¶ 18. The charged wires spanned the time period of May 29, 2015, to March 13, 2017. *Id.*

The bank fraud count charged Patterson with a check-kiting scheme that Patterson implemented by writing two bad checks from one of his bank accounts to another and then moving the funds before Bank of America could reverse the transaction. *Id.* ¶¶ 26-31. The tax evasion count charges Patterson with evading the payment of federal taxes between January 2014 and September 2016 by keeping no personal bank accounts, paying for expenses with a credit card in his girlfriend's name, which he then paid off in cash, and by paying for a large volume of his personal and business expenses in cash. *Id.* ¶ 38.

Patterson pleaded guilty without a plea agreement to each charge of the indictment on October 19, 2021. Dkt. 140. As to Counts 1 through 6, Patterson admitted that he "knowingly devised a scheme to obtain money from H.Q. by means of materially false pretenses…by falsely telling her that he was on the verge of acquiring a skilled nursing facility in Pasadena, California." Ex. A at 31-32 (Transcript of October 19, 2021 Change of Plea Hearing). Those representations, Patterson admitted, were "material to H.Q.'s decision to pay Defendant approximately $555,000…." Patterson admitted that he "did not intend to, and did not, use the funds H.Q. gave him for the purposes of acquiring the skilled nursing facility." *Id.* at 32. "He instead used the funds to pay business expenses unrelated to the skilled nursing facility, and for gambling." *Id.* at 2. Patterson also admitted executing a scheme to defraud Bank of America, charged in Count 7, and to evade federal income taxes, charged in Count 8. *Id.* at 33-35.

### III.  ARGUMENT

#### A.  Threshold Legal Issues

##### 1.  Use of Hearsay from Interview Memoranda

In arguing that Patterson defrauded H.Q. of a total of $1,143,000, and that certain sentencing enhancements apply, the government intends to rely on statements by H.Q. memorialized in federal agents' memoranda of interviews. These statements are admissible because corroborating evidence confirms they are reliable. *See United States v. Littlesun*, 444 F.3d 1196, 1200 (9th Cir. 2006) (confirming that Confrontation Clause does not apply to admission of hearsay at sentencing and that

such hearsay "is admissible at sentencing so long as it is accompanied by some minimal indicia of reliability") (internal quotations omitted).

In her interviews with agents, H.Q. stated that all the money she gave to Patterson was for Patterson to acquire the skilled nursing facility. Ex. B at 3 (Mem. Jan. 30, 2018 Interview of H.Q.). H.Q. also outlined numerous payments made to Patterson and confirmed specific checks as those given to Patterson. *Id.* These facts have been further buttressed by numerous exhibits that were provided in the discovery to the Probation Officer in preparation of the final Presentence Investigation Report.

### 2. Standard Applicable to Enhancements

When disputed sentencing enhancements have a "disproportionate impact" on the sentence, the Court must apply the clear and convincing standard when determining whether an enhancement should apply. *See United States v. Jordan*, 256 F.3d 922, 927 (9th Cir. 2001) (comparing cases and noting that in one case a seven-level enhancement had a disproportionate impact on the sentence whereas a four-level increase was not an exceptional case that required the clear and convincing standard). Given the number of enhancements in dispute in this case, the clear and convincing evidentiary standard should apply when determining whether the facts at issue support the application of an enhancement in this case.

### B. Sentencing Enhancements

#### 1. Substantial Financial Hardship to the Victim – § 2B1.1(b)(2)(A)(iii):

The United States agrees with the PSR that a two-level increase should apply because the offense in question resulted in substantial financial hardship to H.Q. *See* PSR ¶ 64. As noted in Application Note 4(F) in U.S.S.G. § 2B1.1, the court shall consider, among other factors, whether the offense resulted in the victim "making substantial changes to his or her employment, such as postponing his or her retirement plans." When interviewed by the FBI, H.Q. confirmed that the losses associated with the fraud have left H.Q. and her husband with over an extra million dollars in debt. Ex. C. at 1. (Mem. Aug. 3, 2021 Interview of H.Q.). H.Q. also told the agent that she believes this debt has caused her to delay her retirement for potentially another ten years. *Id.*

While the defense argues in part that this enhancement should not apply because H.Q. and her husband have other assets, whether H.Q. has other income or property does not, in any way, show that this loss has not caused H.Q. to make substantial employment changes including the postponement of her eventual retirement. Having to make substantial changes to one's retirement plan is enough to justify the two-point enhancement under § 2B1.1(b)(2)(A)(iii). *See United States v. Stratos*, 775 Fed. App'x 352, 353 (9th Cir. 2019). Rather than address this fact, the Defense instead chose to baldly accuse the victim of misleading federal investigators, Dkt. 156 at 23, 25, and speculate without factual support the value and income associated with the victim's properties and business. *See id.* at 17-23. There is simply no reason to discount H.Q.'s statements to the FBI in this case and the enhancement should apply as recommended in the final PSR.

 2. Sophisticated Means – USSG § 2B1.1(b)(10)(C):

The United States agrees with the PSR that a two-level increase should apply because the offense involved sophisticated means. *See* PSR ¶ 65. As outlined in the PSR, Patterson spent years misleading H.Q. and providing various explanations for why she needed to continue to send him additional funds. As part of his misrepresentation, Patterson even provided H.Q. with copies of the nursing facility's tax returns in an effort to conceal his fraud. *See* PSR ¶ 21.

The use of "coordinated and repetitive steps" to affect a fraudulent scheme and conceal the fraud justifies the application of the sophisticated means enhancement. *See United States v. Thomsen*, 830 F.3d 1049, 1073 (9th Cir. 2016) (citing additional cases holding that the underlying scheme need not be highly complex or exhibit exceptional brilliance); *see also United States v. Gaye*, 902 F.3d 780, 791 (8th Cir. 2018) ("Sophisticated means need not be highly sophisticated, and the adjustment is proper when the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety offense . . . The sophistication of the offense conduct is associated with the means of repetition, the coordination required to carry out the repeated conduct, and the number of repetitions or length of time over which the scheme took place."); *United States v. Borders*, 829 F.3d 558, 570 (8th Cir. 2016) (holding proper the application of the sophisticated means enhancement where defendant was connected to several events over a period of time, the scheme involved thousands of dollars, and the defendant undertook multiple steps necessary for the scheme's success). Here, Patterson's repetitive conduct and

attempts to conceal the nature of the fraud for over two years meets the standard for sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C) and the enhancement should apply as recommended in the final PSR.

        3.      <u>Abuse of Position of Trust or Use of Special Skill – USSG § 3B1.3</u>:

The United States agrees with the PSR that a two-level increase should apply because the defendant abused a position or special skill in a manner that significantly facilitated commission of the offense. *See* PSR ¶ 67. A "special skill" refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. *See* U.S.S.G. § 3B1.3 n. 4. The enhancement also applies when "the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not." U.S.S.G. § 3B1.3 n. 3. When evidence shows that the defendant led the victim to believe that he occupied a position of trust or had some special skill, the enhancement is appropriate. *See United States v. Groves*, 594 Fed. Appx. 332, 334 (9th Cir. 2014).

In this case, Patterson was holding himself out as having special skills as a loan broker or person with substantial experience in obtaining financing, and he used those skills (and H.Q.'s perception that he had those skills based on what he told her) to defraud H.Q. *See* PSR FNs 6 and 8 (discussing Patterson's experience and special skills). First, he helped H.Q. refinance her gas station as a cash-out refinance so that she could give him money. Second, he told H.Q. that he was getting a loan to buy the facility, and H.Q. believed him because he'd brokered her refinance and because he talked with her about his successes in obtaining finance. Third, he used his connection with the skilled nursing facility (and the documents he obtained from the facility) to convince H.Q. to give him money, a connection he only had because he was helping the facility attempt to refinance. Patterson could not have convinced H.Q. to give him money if he was not connected to the facility as their loan facilitator and if H.Q. had not believed he could finance the deal using his substantial experience. Here, Patterson's relationship with the SNF and H.Q. and his specialized skill set support the two-level increase for his role in the offense as recommended in the final PSR.

        4.      <u>Obstruction of Justice – USSG § 3C1.1</u>:

The United States agrees with the PSR that a two-level increase should apply because the defendant willfully obstructed or attempted to obstruct justice in the investigation, prosecution, or

sentencing of this case. *See* PSR ¶ 68. Section 3C1.1 applies in light of the false statements made by Patterson in connection with various pretrial release revocation proceedings. In *United States v. Taylor*, 749 F.3d 842, (9th Cir. 2014), the court affirmed the application of the obstruction enhancement based on the defendant's false testimony at his bond revocation hearing. The court reasoned that "outright falsehood during that detention period" is part of the process involving the determination of whether the defendant should be detained or not. *Id.* at 845. The court also noted that there is no requirement under Section 3C1.1 that the "obstructive conduct relate substantively to the offense of which the defendant is convicted, so long as the conduct relates to the investigation, prosecution or sentencing of the underlying federal offense." *Id.* at 846. In *United States v. Magana-Guerrero*, 80 F.3d 398, 401 (9th Cir. 1996), the Ninth Circuit held that the defendant had obstructed justice when he "provided materially false information to a pretrial services officer who was conducting a bail investigation for the district court." Finally, the obstructive conduct need not relate substantively to the offense of conviction, rather the conduct may merely affect the ongoing proceedings. *See United States v. Hernandez-Ramirez*, 254 F.3d 841, 844 (9th Cir. 2001) (holding that "providing a false financial affidavit to a magistrate judge to obtain legal representation relates to prosecution of the offense").

    Here, there are numerous instances where Patterson provided false statements to the court and to Pretrial Services. First, in a May 28, 2020, declaration, Patterson falsely stated that attachments to an email he received were "unnamed." Dkt. 32-2. Patterson filed the declaration in support of his opposition to the government's request to revoke his pretrial release because he had violated a pretrial release condition by receiving and reviewing a client's financial information. Patterson's contention that the attachments were unnamed is important because it relates to whether he knew, when he opened them, that they contained financial information. In reality, the attachments Patterson received were not unnamed. They were named "2017 Individual 2523OR-S," 2523 being number of an IRS form for small businesses. Dkt. 19-3 at 3. Moreover, the body of the email stated, "Morning Kenneth. Attached you will find the returns requested by [potential client]." *Id.* And, indeed, the attachments were tax documents.

    Second, the defendant made false statements to Pretrial Services after he was arrested for driving under the influence and for a hit-and-run in Pismo Beach in September 2020. During a revocation

hearing on October 21, 2020, Patterson's Pretrial Services Officer, Jessica McConville, testified about her conversation with Patterson after the arrest. Officer McConville testified that Patterson told her that he had "sideswipe[d]" a vehicle and then "decided to drive home" because he had "some type of burn on his leg." Dkt. 89 at 9. He told her that, once he got home, he "called the police to report the accident." *Id.* Officer McConville also testified, "So I asked him specifically, 'Were you drinking that night?' And he said, No, he was not." *Id.* at 9-10. After Officer McConville received the police report, she again spoke with Patterson, testifying that she and Patterson "spoke at length" and that he "continued to deny that he was drinking that night despite the police report referencing that, you know, he was intoxicated." *Id.* at 26. She continued, "He, you know, continued to attest that he had not been drinking that night, and it's, you know, virtually impossible for him to be drinking due to his recent weight loss surgery." *Id.*

These statements to Officer McConville were not true. As Judge Boone found in his written order revoking Patterson's release, "On September 19, 2020, after drinking a couple beers, Defendant drove with his friend to get some ice." Dkt. 79 at 5. "Defendant was intoxicated when the police arrived to investigate" the crash. *Id.* at 6. Judge Boone's Order also states the following: "Here, Defendant admitted to drinking several beers prior to driving and fleeing the scene of the accident because he did not want to be cited for driving under the influence. The [Court] finds probable cause that Defendant violated section 23152(a) by driving under the influence." *Id.* at 79.

Finally, Patterson obstructed justice when he caused his doctor to submit a letter to the Court that contained the false statements that Patterson could not have been driving and could not have been drinking on the night of the hit-and-run. Patterson filed that letter to the Court twice in connection with his attempts to avoid detention. The letter contained the following statement after discussing Patterson's obesity and gastric sleeve surgery: "For this reason, it is my medical opinion that he was not drinking on 9/20/2020. Physiologically, he would not have been able to start and drive a car due to his Gastric Sleeve surgery." Dkt. 97. During a December 9, 2020, hearing, Judge McAuliffe asked the doctor whether he made those statements based on what Patterson told him. The doctor said this was the case. Accordingly, Patterson caused his doctor to make false statements to the Court. Dkt. 147. For all these

reasons, the two-level increase for obstruction of justice applies in this case as recommended in the final PSR.

### C. Statutory Sentencing Factors

The sentencing guidelines are merely the "starting point and initial benchmark" when determining the appropriate sentence in a given case. *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines range is not presumptively reasonable, rather, a judge "must make an individualized assessment based on the facts presented." *Id.* at 50. The court may consider, "without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited [by the guidelines or other law]." *United States v. Boykin*, 785 F.3d 1352, 1363 (9th Cir. 2015). Additionally, the court is not prohibited from concluding that the applicable Guideline range gave too much or too little weight to a single factor when determining the final sentence. *United States v. Christensen*, 732 F.3d 1094, 1101 (9th Cir. 2013) (holding that a court may vary upward based on factors already incorporated into the Guidelines calculations).

Consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a) demonstrates that the sentencing guidelines in this case would not appropriately and fairly account for the nature and circumstances of the offenses, the need for the sentence to reflect the seriousness of the offenses, protect the public, afford general and specific deterrence to similar criminal conduct, and the history and characteristics of the defendant. Rather, an upward variance is necessary given the extreme nature of the defendant's continued misconduct and the fact that the defendant's criminal history category substantially underrepresents the seriousness of the defendant's criminal history and the likelihood that he will continue to commit crimes. Furthermore, the history and characteristics of the defendant do not, in any way, justify a downward departure. For these reasons, a sentence of 135 months is appropriate in this case.

As noted in Section B, the underlying criminal conduct in this case is significant and resulted in substantial losses to the victim. After being indicted and released pre-trial, the defendant demonstrated a

complete lack of remorse[1] and respect for the court by continuously violating the terms of his release, filing false documents with the court, and committing additional offenses while on release.  In addition to these instances, the defendant's conduct during incarceration has shown a lack of any true rehabilitation.  While incarcerated, the defendant was involved in multiple altercations with inmates and assaulted another inmate after accusing him of stealing.  PSR ¶¶ 11, 13.  Additionally, the defendant was found in possession of four weapons when officers searched his belongings during another incident.  PSR ¶ 12.  This continued misconduct while on release and later in custody shows a wanton disregard for the law and highlights the defendant's likelihood to continue to commit crimes.

An upwards variance is appropriate when a defendant's criminal history category either significantly under-represents the defendant's criminal history or the likelihood that the defendant will commit further crimes.  *United States v. Connelly*, 156 F.3d 978, 984 (9th Cir. 1998).  In this case, the defendant has had numerous adult encounters with law enforcement dating back almost 25 years.  PSR ¶¶ 87-106.  These have resulted in several fines, instances of probation, and periods of incarceration.  One of these instances involved the defendant's probation being revoked on three separate occasions in less than three years.  PSR ¶ 93.  Despite this extensive history, the defendant only registers as a criminal history category II.  *See* PSR ¶ 99.  This history and conduct show a defendant who has repeatedly violated the law in the past and is likely to continue to commit further crimes.  As such, an upward variance is warranted.

Finally, the defendant now attempts to explain his behavior and justify why he should receive a lesser sentence in part based on a purported severe gambling addition and undiagnosed bipolar disorder and the custodial conditions experienced during his pre-trial detention.  Patterson's claims regarding his mental health and history are supported extensively by the report of Dr. Howsepian.  This report is based, at least in part, on the doctor's interview with the defendant.   As explained above, Patterson is willing to provide false information to medical professionals in order to justify his actions and avoid punishment in this case.  As previously noted by this Court, Patterson "cannot be trusted" and that he

---

[1] Note that the sentencing guidelines specifically contemplates the fact that Obstructing or Impeding the Administration of Justice enhancement ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct.  U.S.S.G. §3E1.1, Application Note 4.

"will not tell the truth." Dkt. 103, 11:19-20. Judge McAuliffe specifically noted that Mr. Patterson has "lied for medical advice before." Dkt. 147, 58:11.

During that same hearing, the defendant raised issues regarding his medical treatment and the custodial conditions he was experiencing, including claims that the jail was not providing adequate medical care. These assertions were rebutted by Dr. Gill, one of three staff physicians employed full-time at Fresno County Jail. *See* Dkt. 119, Ex. B. As outlined in that interview report, the defendant routinely declined medical treatment and had "close to 100 refusals documented in his medical file." *Id*. Any lack of care or issues that Patterson experienced while in custody appear to be, at least in part, self-created by his refusal of medical care. For all these reasons, neither the defendant's purported mental health issues nor the custodial conditions experienced should justify a reduction in the defendant's final sentence.

## IV.     CONCLUSION

For the foregoing reasons, the United States recommends that the Court impose a sentence of 135 months imprisonment, an upward variance from the applicable guideline range, which is a sentence sufficient, but not greater than necessary, to meet the considerations set forth in 18 U.S.C. § 3553(a).

Dated: April 11, 2022

PHILLIP A. TALBERT
United States Attorney

By:  /s/ ALEXANDRE DEMPSEY
ALEXANDRE DEMPSEY
Assistant United States Attorney