Galatea DeLapp, CA Bar #181581
Attorney at Law
1541 East Fairmont Ave., Suite 104
Fresno, CA 93704
(559) 803-0471


Attorney for Defendant
Kenneth Shane Patterson

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 1:19-cr-00230 DAD-BAM |
|---|---|
| Plaintiff, | |
| v. | DEFENDANT'S SENTENCING MEMORANDUM & FORMAL OBJECTIONS |
| KENNETH SHANE PATTERSON, | Date: September 6, 2023 |
| Defendant. | Time: 11:00 am |
| | Judge: Hon. Dale A. Drozd |

## I. INTRODUCTION

On October 19, 2021, Mr. Patterson pled guilty to eight counts of an eight-count Indictment. Counts 1, 2, 3, 4, 5, and 6 charges Fraud by Wire, Radio, or Television, in violation of 18 U.S.C. § 1343; Count 7 charges Bank Fraud, in violation of 18 U.S.C. § 1344; Count 8 charges Attempt to Evade or Defeat Tax, in violation of 26 U.S.C. § 7201.

There is no plea agreement in this case.  Mr. Patterson, recognizing the errors of his ways, his untreated severe Gambling Disorder, his undiagnosed bipolar disorder, and their impact on others, did not want to burden the victim, jurors, or the court by unnecessarily wasting their time. He fully accepts responsibility for his conduct, constituting the elements of the charged offenses,

and freely admitted to what he did, in the factual basis submitted to the court at the time of the plea. The victim in this case had credibility issues. Many of the extraneous factual descriptions alleged in the indictment, and by victim, Helen Quan, some of which have been incorporated into both the Revised and Second Revised PSR are not fully accurate.  Some of Ms. Quan's statements to government investigators are contradicted by other statements of Ms. Quan to government investigators, or by documentation provided by outside entities. These statements and documentation are noted within this memorandum for the court's consideration in obtaining a full and complete picture.

The Second Revised PSR calculates a guideline range of 57-71 months based on a criminal history category II and an applicable offense level of 24 calculated as follows:

**Counts 1-7** were grouped pursuant to USSG §3D1.2(d) resulting in a base level of  7 pursuant to USSG §2B1.1; a 14 level increase, pursuant to USSG §2B1.1(b)(1)(H); a 2 level  enhancement for substantial financial hardship to the victim, pursuant to USSG §2B1.1(b)(2)(A)(iii; and a 2 level enhancement for obstruction of justice, pursuant USSG §3C1.1 for an adjusted offense level of 25.

**Count 8** was calculated by finding a base level of 20, pursuant to USSG §2T1.1(c)(1) & USSG §2T4.1(H); a 2-level increase for sophisticated means pursuant to USSG §2T1.1(b)(2) and resulted in an adjusted offense level of 22.  Because this count was not grouped, it was adjusted as a 2-level increase to the higher adjusted offense level of Counts 1-7 pursuant to USSG §3D1.4

**The Total Offense Level** was calculated at 24 after the combined adjusted offense level of 27 received a 3-level reduction for acceptance of responsibility pursuant to USSG §3E1.1(a) & USSG §3E1.1(b).

The defense objects to the following calculations, applications, and conclusions:

2

**§2B1.1(b)(2)(A)(iii) - 2 level enhancement for substantial financial hardship to the victim**, because the victim has a $20-$25 million-dollar net worth and the victim's statements alone in support of this enhancement are not credible.[1] This court previously ruled this enhancement did not apply based on an insufficient showing by the government of evidence beyond the victim's mere statements that she could not retire.[2]  There has been no new discovery provided by the government on this issue.

**PSR ¶52 listing the California State Franchise Tax Board as a part of the restitution total,** because the 9th Circuit remanded this case based partly on this court having no authority to include them in a restitution order in this matter**.**

**Recommendation to order restitution to begin immediately,** because Mr. Patterson does not have the ability to pay restitution immediately.

## II. FACTS

### A. DEFENDANT CREDIBILITY

Based on the nature of the offenses and past procedural history, the defense is mindful that Mr. Patterson has serious credibility issues with this court and others.  As a result, the facts presented here are based on documents, and investigative interviews with those who do not have credibility issues, except for quoted interviews with Helen Quan, who has credibility issues based on contradictory statements and documents as provided herein.  The report of Doctor Howsepian has been supported extensively with independent interviews and letters and he has incorporated detailed citations to supporting interviews and letters so that any claims Mr. Patterson made could be substantiated by other witnesses.

---

[1] Outlined extensively in Memorandum section: II.E.3 QUAN NET WORTH, and previously in Dkt 156 Memorandum section: II.E.3 QUAN NET WORTH, both with supporting documentation attached and referenced therein.

[2] Dkt. 171 - April 18, 2022, Sentencing Transcript pg.15:14-21, pgs.19:24-25 & 20:1-14

**B.  PARENTHOOD, EMPLOYMENT, COMMUNITY HELP**

The letters submitted to the court in support of Mr. Patterson establish that he had a successful decades long career in business development.  He helped people in *extraordinary* ways for nearly two decades and did not engage in a pattern or practice of scamming them.  These letters, from family, friends, business acquaintances, and other members of the community reflect multiple common themes, including how much Mr. Patterson has helped others professionally and personally — both financially and emotionally — how much others trust him, have confidence in him, and can depend on him, how he helped save multiple small businesses, how much he loves his family and friends, how he has been a mentor to multiple people, how generous and dependable he is in support of the community, specifically high school athletes, battered women and displaced children, how he is a man of his word, how he is a good friend, a good father and husband, how he is a consummate professional, and how polite, selfless, and responsive to others needs that he is, and how he has shown deep remorse for his wrongdoings[3]. These letters have been provided to the court as attachments to the Second Revised PSR, and many of them have been quoted and highlighted extensively in the report of Dr. Howsepian and are hereby incorporated by reference.[4]

**C.  MR PATTERSON'S CHILDHOOD**

Dr. Howsepian extensively addresses Mr. Patterson's heartbreaking childhood of extreme physical, emotional, spiritual, and sexual abuse, as well as, maternal abandonment, and exposure to multiple significant familial adults with untreated bipolar disorders, drug addictions, and gambling issues. His adult success, commitment to family, including family members who abandoned him, and his help and support of the community is extraordinary given these early

---

[3] Dkt. 156 - Exhibit 1 Howsepian Report at p.26

[4] Dkt. 154-7

hardships.

Dr. Howsepian reports Patterson witnessed his father shooting a gun next to his mother's head, slitting his mother's throat, and leaving her naked in the streets[5]. Patterson endured beatings by his father, who used belts, his hands, kicks, and extension cords[6]. Child Protective Services (CPS) was called.  A family member reports it was a daily experience that Patterson's father would not let him out of bed in the morning until he spoke in tongues. He was forced to stay on his knees and not get up, not even to go to the bathroom until Kenneth spoke in tongues, whether it took fifteen minutes or five hours.[7]  Patterson felt unsupported by his parents, was repeatedly beaten in a manner that left marks on his body and had a seriously mentally ill father.[8]  He experienced extensive humiliation and belittling by his father[9]. He was neglected and abandoned by his mother due to her drug habit and he experienced pain and confusion over how she leave him with his father who he has described as "a monster."[10] The stayed with his grandmother for months at a time to escape from his father's abusiveness[11].

His mother, who abandoned Mr. Patterson as a child, after she suffered serious physical and emotional abuse from Mr. Patterson's father, became plagued by guilt and a lack of confidence and turned to drugs and prostitution[12]. She recounts how "Kenneth is the one that got her out of Motel [D]rive [where she was prostituting herself and abusing drugs],"and that "through the years, Kenneth would come to the [M]otel [D]rive just to check up on her…he…told

---

[5] Dkt. 156 - Exhibit 1 Howsepian Report at p.14: ¶2

[6] *Id.* at p.14: ¶2

[7] *Id.* at 26: ¶2

[8] *Id.* at p.14: ¶2

[9] *Id.* at p.14: ¶2-15: ¶1

[10] *Id.* at p.15: ¶1

[11] *Ibid.*

[12] *Id.* at p.17: ¶1-p.6: ¶1

her not to worry and that he would get Michelle her own apartment."[13] She said that her son got her an apartment, bought her furniture, set her up, and told her that the only thing she needed to do was to stay away from drugs. She said that she "has been sober since the [S]pring of 2006 thanks to Kenneth."[14]

### D.  GAMBLING DISORDER, UNDIAGNOSED BIPOLAR DISORDER & ADDICTIVE COPING MECHANISMS

Dr. Howsepian has diagnosed Mr. Patterson with Gambling Disorder, a previously undiagnosed Bipolar Disorder, Type I, Attention-Deficit/Hyperactivity Disorder (ADHD), Cocaine Use Disorder, in remission, in a controlled environment, Benzodiazepine Use Disorder, in remission, in a controlled environment, and Alcohol Use Disorder, in remission, in a controlled environment[15].

From 2003 through 2017, Mr. Patterson suffered periodically from the most severe Gambling Disorder Dr. Howsepian has evaluated in over 20 years of practicing psychiatry[16]. According to Dr. Howsepian, Mr. Patterson's undiagnosed Bipolar Disorder "adds substantial fuel to the fire of his gambling addiction:  profoundly increasing his energy, altering his mood, decreasing his need for sleep, and further impairing his judgment.[17]"  In Dr. Howsepian's professional opinion, primarily as a result of a profoundly severe Gambling Disorder, at the time of the offenses, Mr. Patterson was greatly impaired in his ability to understand the wrongfulness of his actions, to appropriately exercise his power of reason, and to control his offensive

---

[13] *Id.* at p.34: ¶1

[14] *Ibid*.

[15] Second Revised PSR ¶132

[16] Second Revised PSR ¶133

[17] Second Revised PSR ¶133

behavior[18].

## E. THE OFFENSES & VICTIM NET WORTH

The victim in this case, Helen Quan, is an extremely sophisticated businesswoman who has presided as Trustee, President, and C.E.O. of her substantial real estate assets and assorted business enterprises for over twenty-five (25) years.  Ms. Quan is the Trustee of the Quan Family Trust (QFT).  Helen & her husband, Nelson Quan, are the trust beneficiaries.  Many of the Quan entities and enterprises are held within the QFT.  Ms. Quan currently has a net worth of approximately $20-25 million.[19]

### 1.  QUAN SERVICE CENTER FINANCING

One of the QFT entities is the Quan Service Center, Inc. (QSC), a Chevron Gas Station and convenience mart in a prime location just off a major freeway on a busy thoroughfare in Los Angeles, California.[20]  The Quans had owned the land at this location since at least 1998[21] and when the relevant conduct in this case began, were leasing, from Chevron, the Chevron building and Chevron equipment on the Quan land. Chevron, in return, leased from the Quans, the land upon which the Chevron building and Chevron equipment was located.[22]  It was an unusual and complicated arrangement with eventual issues of uncertainty for all parties. Chevron's lease agreement with the Quan's was coming to an end. Chevron was interested in getting out of this complicated arrangement.   In late 2013, Ms. Quan sought a Small Business Administration (SBA) 7A loan for QSC existing debt consolidation, to purchase the Chevron Building, Chevron

---

[18] Second Revised PSR ¶134

[19] Dkt. 156 - Exhibit 3A. Baxter at p.2: ¶6; Outlined extensively in Memorandum section: II.E.3 QUAN NET WORTH

[20] Dkt. 156 - Exhibit 3B. Quan Service Center Map & Pictures

[21] Outlined extensively in Memorandum section: II.E.3 QUAN NET WORTH

[22] Dkt 156 - Exhibit 3A. Baxter at p.3: ¶2

equipment, other items from Chevron, and to obtain $50,000 in discretionary working capital.[23] Once QSC stopped leasing these Chevron assets, the net savings would substantially increase Quan's income.[24] Ms. Quan originally contacted her personal loan broker to help her obtain financing, who then referred her to Mr. Patterson to help facilitate the loan as an SBA document packager.[25] This own-instead-of-lease plan was designed to result in net savings that could be applied to increased profits of at least $120,000.00 and up to $240,000 per year.[26] Ms. Quan has claimed to government investigators that banks do not like to lend money to gas stations because they do not make any money.[27]  In fact, SBA preferred lenders are eager to lend money to gas stations because name branded service stations, like Chevron, Shell, Mobile, etc. with convenience marts onsite, make lots of money  and this station was in the top 10%-20% of profitable stations.[28]

The type of SBA 7A loan Ms. Quan was seeking required extraordinary and substantially complex documentation and receipts that must be provided by the applicant.[29]  Therefore, document packagers are used. Brokers typically do not deal in this level of documentation. Mr. Patterson's successful SBA document packaging business is based on referrals. Ms. Quan has claimed that Mr. Patterson was found based on a marketing postcard, or flyer depending on which

---

[23] Second Revised PSR ¶20 relies on Quan's claims that the SBA loan was merely for debt refinancing/consolidation. This was not true. See also Dkt. 156 - Exhibit 3C. Umpqua QSC Term Loan Sheet

[24] Dkt. 156 - Exhibit 3A. Baxter at p.3: ¶2

[25] Dkt 156 - Exhibit 2A. Quan Interview 1, p1:19-24. Second Revised PSR ¶31 states: "Quan said Patterson helped her get an SBA loan for a gas station. Because Patterson was a broker, Quan understood Patterson was able to secure a loan."  Patterson was not a loan broker and did not represent that he was a loan broker. Ms. Quan already had a loan broker. Mr. Patterson did not "secure her loan."

[26]Dkt. 156 - Exhibit 3A. Baxter at p.3: ¶2-3

[27]Dkt. 156 - Exhibit 2E. Quan Interview 5, p.3: ¶3 & Exhibit 2D Quan Interview 4 at p.2: ¶4

[28] Dkt. 156 - Exhibit 3A. Baxter at p.3: ¶4 & p.5: ¶4

[29] *Id*. at p.5: ¶3

time she was interviewed by the government.[30]  Mr. Patterson does not and has not engaged in mailer or postcard marketing.[31]  Mr. Patterson did have a have a business website, however, Ms. Quan states she never saw the website.[32]

Document packagers, while authorized agents of SBA preferred lenders, are not loan brokers.  There are no commissions for SBA loans paid to either brokers or document packagers.[33]  Document packagers are limited by the SBA as to what fees can be charged for document packaging services and the maximum document packaging fee to a potential borrower is $2,500.[34]  SBA loans do require facility appraisals, and gas station SBA 7A loans require environmental reports.[35]  Packaging fees and costs for these required reports are typically in the $7500-$10,000 range.[36]  These costs and fees are obtained ***upfront*** by the document packager who secures the appraisal and environmental reports on behalf of the applicant.[37]  Later, at the time of closing, those advanced fees are transferred by the packager to the lender as part of soft closing costs reflected on the loan term sheet and later reconciled.[38]

Once the loan is completed, the bank, not the customer, pays a referral fee to the person who brought in the customer, that person might or might not be the document packager. These are

---

[30] See Second Revised PSR ¶20 referencing a January 18, 2018, government interview where Quan claimed her loan broker found Patterson through a flyer. In a subsequent government interview Quan claimed: "Patterson never talked to Quan about his website. Quan found Patterson through a mailer postcard. Quan called Patterson seeking an SBA loan for the gas station..." [Dkt. 156 - Exhibit 2E Quan Interview 5 at p.3: ¶3]

[31] Dkt. 156 - Exhibit 3A. Baxter at p.5: ¶6

[32] Dkt. 156 - Exhibit 2E. Quan Interview 5 at p.3: ¶3

[33] Dkt. 156 - Exhibit 3A Baxter at p.4: ¶3

[34] Id. at p.3: ¶6 & Dkt. 156 - Exhibit 3D. SBA SOP p.316-318, CHAPTER 8: ALLOWABLE FEES, II &III. B.5.

[35] Dkt. 156 - Exhibit 3A. Baxter at p.3: ¶6

[36] *Id*. at p.4: ¶1-2

[37] *Ibid*.

[38] Dkt 156 - Exhibit 3C. Umpqua QSC Term Loan Sheet at p.1

called referral fees and not commissions in the SBA industry.[39] Initially, Ms. Quan gave Mr. Patterson a check for $8,000.00 to cover the required appraisal and environmental report, and regulated packaging fee. Ms. Quan's statements to government investigators that these were "loan fees" she paid as a "broker" fee for his personal use are not supported by the facts. Appraisals and environmental reports on her property were required and paid from these funds, as required under SBA SOP's and revealed via the Umpqua QSC Term Loan Sheet.[40] Mr. Patterson was not a broker and did not represent himself to be one as Ms. Quan's loan broker referred her to Mr. Patterson for document packaging services.[41]

Ms. Quan eventually provided the necessary documentation to obtain her QSC SBA 7A loan for prior debt reconsolidation, equipment purchases, and inventory.  Her loan was eventually funded in May 2015 and, despite her claims to government investigators, she received no funds for the $50,000 in discretionary working capital she originally sought.[42].

2.  THE SKILLED NURSING FACILITY/GROCERY STORE GAMBLE

In addition to QSC, The QFT owned a residential care home and a health care corporation[43]. Months before Ms. Quan's QSC SBA 7A loan was approved, Ms. Quan expressed an interest to Mr. Patterson in expanding her then existing health care operations. There was a skilled nursing facility (SNF) close to Ms. Quan. Mr. Patterson was aware the property owner of

---

[39] Dkt. 156 - Exhibit 3A. Baxter at p.4: ¶3

[40] Second Revised PSR ¶20 relying on Quan's statements this was a "loan fee" paid to Mr. Patterson to "engage his services as a broker" and Victim Impact Statement claiming: "We met Kenneth Patterson when we hired him in 2013 to help us obtain a SBA loan. On or about May 2015, we did receive a loan in the amount of $ 1,750,000.00 with his assistance. He received a commission as part of the transaction." (Dkt. 154-6 at ¶5).; See also Dkt 156 - Exhibit 3C. Umpqua QSC Term Loan Sheet at p.1, and Dkt. 156 - Exhibit 3D. SBA SOP p.316-318, CHAPTER 8: ALLOWABLE FEES, II &III. B.5.

[41] Dkt 156 - Exhibit 2A. Quan Interview 1, p1:19-24.

[42] Dkt. 156 - Exhibit 3E. 5-20-15 SBA Umpqua Loan Distribution

[43] Outlined extensively in the section II. QUAN NET WORTH below.

the SNF was in receivership, and she had been precluded from institutional financing of any kind. He believed this property would go into default and he could obtain it for a fraction of its value and hoped to partner with Ms. Quan, but Ms. Quan wanted the property for herself. She claims to government investigators that she believed she would obtain from Mr. Patterson for $4 million a skilled nursing facility (SNF) worth $16 million, after he acquired it for $3 million and he would be "happy" to make only $1 million on this deal, while she received a $12 million windfall in the process.[44] Regardless of her extraordinary claims about Mr. Patterson's generosity in happily passing along a purported $12 million windfall, the agreements they reached about this potential transaction were memorialized in January & February 2015 by way of executing two (2) Memorandums of Understanding (MOU1 & MOU2),[45] the latter of which was notarized. The MOUs had been edited and reviewed by both parties before they notarized it according to emails between the parties.[46]

Both MOUs listed the purchase price of the property to Ms. Quan at $4 million should Mr. Patterson acquire it and stated that Mr. Patterson was on the "verge of acquiring" it.[47]  The MOU does not claim it was worth $16 million, nor did Patterson represent it was.  The understanding memorialized in the MOU's provide that **should Mr. Patterson acquire the property,** he would purchase it for **himself,** and then Quan would purchase it **from him** for $4 million.  Ms. Quan had already agreed to loan Mr. Patterson the monies in this matter well before the MOUs were drafted.

The fraudulent inducement in this case begins when at the time of MOU2 and its final

---

[44] "Quan claims Patterson told her the facility was valued at $16 million and he was buying it for $3 million but would sell it to her for $4 million and would be happy to make $1 million on the deal." [Dkt. 156 - Exhibit 2A Quan Interview 1, p. 2:37-40]

[45] Dkt. 156 - Exhibit 4A. MOU1 & Dkt. 156 - Exhibit 4B. MOU2

[46] See e.g. Dkt. 156 - Exhibit 4C. MOU 2 Negotiation

[47] Dkt. 156 - Exhibit 4A. MOU1

11

negotiation, Mr. Patterson misrepresented to Ms. Quan the extent of his involvement in this receivership, claiming and memorializing that he was on the "verge of acquiring the facility." He was not. He was gambling that the property, on the verge of foreclosure, would become available for a deeply discounted price before it was foreclosed upon. He convinced himself this would happen but did not have enough accurate information as to how the business property was structured to realize it was not legally possible. He rationalized that his misrepresentations to Ms. Quan were not that bad, because he had convinced himself this purchase was truly possible, and this time, he would win big.

Despite Mr. Patterson's misrepresentations, Ms. Quan understood there were no guarantees that Patterson would be able to acquire & purchase the property for *himself* before selling it to her. She signed MOU1 to that effect on January 31, 2015.[48] Quan knew there was risk, and she knew that if the SNF was not acquired by him, she would eventually get her money back.[49] As she incrementally provided monies to Mr. Patterson, as agreed to in MOU2, monies she originally offered to provide all at once, he executed promissory notes to her, one crafted by her own lawyer, in 2015. These were *loans* to him from her, and he was obligated to pay these funds back.

The MOU2, negotiated between Ms. Quan and Mr. Patterson lists a second SNF property that Mr. Patterson had wishful hopes of buying as well. Helen Quan agreed in the February 2015 notarized MOU2 that she would provide consulting services to Mr. Patterson if he acquired the second facility for *himself*.[50] Despite Quan's claims to government investigators that she was

---

[48] Dkt. 156 - Exhibit 4A. MOU1 section 2D provides: "KP cannot guarantee anything to HQ until the time at which KP has possession of 1450 North Fair Oaks, Pasadena CA 91103." This is the address of the SNF.

[49] Dkt. 156 - Exhibit 2A Quan Interview 1 at p.6:38-39: Quan tells investigators that she was told she was always told that she would get her money back if the deal did not go through further establishing that she knew this was not a guaranteed acquisition.

[50] Dkt. 156 - Exhibit 4B. MOU2 at p.1: ¶8-10

12

just hoping to enter the nursing home business,[51] she was already in it. She already had a residential care home, and an existing healthcare administrator,[52] and her administrator was aware of the SNF.

Ms. Quan has made conflicting statements to government investigators about what she was told, knew, and believed about the status of the SNF.  In January 2018, she told government investigators Mr. Patterson claimed he had been awarded the property in a "probate" deal by the courts.[53] At times she refers to it as a "conservatorship[54]." She also claimed she had **independently verified** through her acquaintances who knew those employed by the SNF that it was indeed involved in a "probate sale."[55] In her December 20, 2021, Victim Impact Statement, she accurately states that Patterson told her the SNF was in "receivership."[56]  The SNF facility was never in probate. It had been in receivership, and Mr. Patterson always called it that.  He had lied about the extent of his involvement with the receivership, but not about the fact of the receivership.

When the SNF property was eventually taken out of receivership in late 2017, Mr. Patterson had not expected this to happen, and panicked over his debt to Ms. Quan, which fueled his escalating rationalizations.

During this time, Mr. Patterson was also attempting a grocery store business start-up in Wasco, California, with an experienced grocery industry partner, Abdulhafed Ali. Ms. Quan was aware of this business venture and had even wired funds directly to Patterson's grocery store

---

[51] Second Revised PSR ¶21 states in relevant part: "Quan believed the transaction would benefit both Quan and Patterson because it would enable her to pursue her interest in entering the nursing home business…".

[52] Dkt. 156 - Exhibit 4D. Health Care Pro & See section II. QUAN NET WORTH, d.e.f.

[53] Dkt. 156 - Exhibit 2A Quan Interview 1 at p. 2:37-40, p.3 :33-35

[54] *Id*. at p.6:2-7

[55] Dkt. 156 - Exhibit 2E Quan Interview 5 at p.1: ¶2

[56] Dkt. 154-6 at p.1: ¶4

business partner, rather than to Mr. Patterson, personally. The cost of the start-up spiraled out of control. Cost over-runs and massive inventory costs were so high, it threatened its eventual opening and success.

The extreme stress over this situation and the funds needed for it fueled his Gambling Disorder and undiagnosed Bipolar Disorder in an extraordinary way. His losses and debts were steep, and his bipolar and gambling disorder resulted in escalating unrealistic assessments of his abilities, and unreasonable expectations of recovering those losses. Mr. Patterson was spending funds borrowed from Ms. Quan to support the store, then table gambling to save the store, and then gambling to cover the losses to Quan from the funds he had borrowed and misused. Mr. Patterson again rationalized that once the store was open, he could pay back the million dollars he borrowed from Ms. Quan. Then he lost the store.

From February 5, 2015, through August 9, 2017, over the course of two and half years, Ms. Quan had incrementally loaned Patterson just over a million dollars, these were funds discovery reveals she had offered to loan him as a lump sum early in 2015. As Ms. Quan began to realize that the SNF was not going to be available for purchase, and no closing would ever come, Mr. Patterson and Ms. Quan executed a notarized promissory note, superseding the previous promissory notes, whereby Patterson agreed to terms, with interest, to pay back Ms. Quan the funds she had loaned him.[57]

Ms. Quan has given differing accounts to government investigators as to the source of funds she provided to Mr. Patterson and the amounts from each source. In her Victim Impact Statement, she claims: "I obtained this money from the following sources: a) Trust funds from the Nelson W. Quan and Helen L. Quan AB Living Trust including most of the proceeds from the

---

[57] Dkt. 156 - Exhibit 4E. Notarized Promissory Note

SBA loan that we had obtained, b) Operating funds from our service station, c) Money borrowed from family members and friends, d) Refinanced a property.[58]"

On February 12, 2022, government investigators reported she told them: "Quan took out $700,000 in equity on the apartments in Pasadena to give to Patterson towards the purchase of the SNF. Quan also took out $500,000 in equity from the gas station towards the purchase of the SNF."[59]   No mention of family and friends or operating funds occurred in this interview. She has claimed to government investigators she took out a cash equity loan from her QSC SBA loan and it to give to Mr. Patterson for the SNF.

First, on January 18, 2018, she told government investigators that she got a "… couple hundred thousand above what was needed for loan consolidation and equipment purchase.[60]" Three years later, on August 3, 2021, she claimed that "Patterson got half of the million dollar loan equity from the first loan with which Patterson was involved.[61]"  Five months later, on December 13, 2021, she told government investigators that "Patterson knew Quan received $500,000 from the Small Business Association (SBA) loan."[62]   Three months later on February 11, 2022,  she told government investigators she "…took out $500,000 in equity from the gas station towards the purchase of the SNF."[63]

The SBA loan Ms. Quan obtained for the QSC, by law, does not allow a loan against equity or any of the proceeds of the loan being used for personal use or for 3rd party associates

---

[58] Dkt. 154-6 at ¶6

[59] Dkt. 156 - Exhibit 2E Quan Interview 5 at p.1: ¶ 3

[60] Dkt. 156 - Exhibit 2A Quan Interview 1 at p.2:25-27

[61] Dkt. 156 - Exhibit 2B. Quan Interview 2 at p.3: ¶ 1

[62] Second Revised PSR ¶29 recounts this interview as follows: "On December 13, 2021, Quan was re-interviewed by an FBI agent and an Assistant United States Attorney. Quan stated Patterson encouraged her to get money out of a refinance loan intended for her gas station business and use that money toward the skilled nursing facility (SNF) which she was interested in buying." Citing Dkt. 156 - Exhibit 2D. Quan Interview 4 at p.1: ¶ 3

[63] Dkt. 156 - Exhibit 2E Quan Interview 5 at p.1, ¶ 3

unrelated to the applying business.[64]   The SBA operates through preferred qualified lenders who are well versed in the Codes of Federal Regulations (CFRs) applicable to SBA loans and are certified to meticulously comply with SBA Standard Operating Procedures (SOPs).[65] These SOPs are an extensive representation of the CFRs that regulate SBA lending.  Ms. Quan did not take out a loan against QSC equity, nor did her loan proceeds include monies for working capital of a couple hundred thousand dollars, a million dollars, or even half a million dollars. Loan documents reveal she received no working capital from the loan.[66]  At best, Quan has misrepresented to investigators the source of expended funds, likely to hide her assets and/or income for her own purposes.

### 3.   QUAN NET WORTH

In the May 2015, Ms. Quan submitted extensive financial statements encompassing years 2011-2014, along with personal tax returns, and QSC tax returns to her QSC SBA lender, Umpqua Bank[67].  The financial statements and loan documents she submitted to Umpqua Bank established her net worth in 2014-15 at $12-$13 million with an adjusted declared net personal income of approximately $300,000 per year.[68]

Based on the appreciation of Quan's real estate assets and other holdings since 2014, she

---

[64] Code of Federal Regulations §120.130: Restrictions on uses of proceeds provides in relevant part: "[The SBA] will not authorize nor may a Borrower use loan proceeds for the following purposes (including the replacement of funds used for any such purpose): (a) Payments, distributions or loans to Associates of the applicant (except for ordinary compensation for services rendered); (c) Floor plan financing or other revolving line of credit, except under § 120.340 or § 120.390; (d) Investments in real or personal property acquired and held primarily for sale, lease, or investment (except for a loan to an Eligible Passive Company or to a small contractor under § 120.310); (f) A purpose which does not benefit the small business; or (g) Any use restricted by §§ 120.201, 120.202, and 120.884 (specific to 7(a) loans and 504 loans respectively)."

[65] These SOPs provide in relevant part: "II. USE OF LOAN PROCEEDS: SBA loan proceeds may be used to finance any of the following: A. Permanent working capital; B. Revolving working capital; C. Furniture and fixtures; D. Machinery and equipment; E. Purchase of land and building including construction and renovations; F. Business Acquisition; and G. Refinancing of existing debt. [Dkt. 156 - Exhibit 3D. SBA SOP, p.74 §II)

[66] Dkt. 156 - Exhibit 3E. 5-20-15 SBA Umpqua Loan Distribution

[67] Dkt. 156 - Exhibit 3AF. QSC Required Loan Documents

[68] Dkt. 156 - Exhibit 3A. Baxter at p.2: ¶ 2-6; p.3: ¶1; p.6: ¶1

currently has an estimated net worth of between $20-25 million.[69]

During the relevant conduct of this action and since, the QFT or Helen & Nelson Quan individually have **AT LEAST** the following assets which are public record:

a.  <u>A Fifteen (15) Unit Apartment Complex</u> at 1601 College View Drive, Monterey Park, California, acquired on June 29, 2004, for $1.75 million.[70]  By May 9, 2012, the Quans owned this property free and clear.[71] On February 11, 2022, Ms. Quan told government investigators she owed $2 million on this property.[72] Title records indicate this new $2 million loan was recorded the day before the interview, on February 10, 2022.[73]  Based on lease listings for this address available online, the Quans were renting these units for at least $1650 per month in 2020 and received rental income from this complex of between $22,000 and $25,000 a month.[74] Rental prices have gone up considerably since 2020 in this area. Pictures of these units available online in show they are well maintained with updated flooring and fixtures.[75] At the time of the first sentencing, there are no vacancies.[76]  In March 2022, just before the previous sentencing, Helen Quan reorganized it as an asset of the newly created entity, Quan Property Management, LLC.[77] Helen Quan is the only Registered Member of this LLC.[78] This property has appreciated in value substantially in the eighteen (19) years since acquisition and has substantial net equity in addition to positive cash flow.

---

[69] *Id*. at p.2: ¶ 6 & p.6: ¶ 5

[70] Dkt. 156 - Exhibit 5A1. Quan Property 1 at p.4

[71] *Id*. at p.1

[72] Dkt. 156 - Exhibit 2E. Quan Interview 5 at p.1: ¶ 2

[73] Dkt. 156 - Exhibit 5A1. Quan Property 1 at p.1

[74] Dkt. 156 - Exhibit 5A2.  1601 College Drive

[75] *Id*.

[76] Dkt. 156 - Exhibit 5A3.  1601 College Drive 2

[77] Dkt. 156 - Exhibit 5A1. Quan Property 1 & Dkt. 156 - Exhibit 5A4. Quan Property Management LLC

[78] Dkt. 156 - Exhibit 5A4. Quan Property Management LLC

b. <u>An Eight (8) Unit Condominium Complex</u> at 432 S Sierra Madre Blvd, Pasadena,

California acquired by the Quans on October 19, 2006, for $2.2 million.[79] The Quans retired their

$1.3 million note against this property after they obtained a new $1.85 million note on January

31, 2017.[80] Five (5) years later, in January 2022, they retired the loan and took out a new $2.4

million loan. Based on lease listings for this address available online at the time of the last

sentencing, the Quans rented each of these units for at least $2,650 per month[81] and receive rental

income from this complex of between $20,000- $22,000 per month. Pictures of these units

available online show they are well maintained with updated flooring.[82] This property has

appreciated in value substantially in the fifteen (16) years since acquisition and had substantial

net equity in 2015.  In 2015, when Ms. Quan submitted financial documents to Umpqua Bank,

this property was worth over $5 million and has appreciated substantially in value over the last

(8) seven years,[83] and has substantial net equity in addition to positive cash flow.

c. <u>A Personal Residence</u> at 865 Donner Place, Monterey Park, California obtained by the

Quans in 1989 for $690,000.[84] This five (5) bedroom four (4) bath, nearly 4,000 square foot home

had a mortgage with a note balance of $210,155.15 at the time of the previous sentencing.[85] The

Quans have maintained a $145,000 Home Equity Line of Credit (HELOC) recorded note with

Bank of America since February 8, 2005, and can borrow up to $250,000 on this line, although

nothing larger than the $145,000 had ever been recorded. On February 12, 2022, Ms. Quan told

---

[79] Dkt. 156 - Exhibit 5B1 Quan Property 2 at p.4

[80] *Id.* at p.2

[81] Dkt. 156 - Exhibit 5B2. 432 Sierra Madre

[82] *Id.*

[83] Dkt. 156 - Exhibit 3A. Baxter at p.2: ¶ 4

[84] Dkt. 156 - Exhibit 5C1. 865 Donner Pl

[85] Dkt. 156 - Exhibit 5C2. Donner Balance & Dkt. 156 - Exhibit 5C3. Quan Property 3

government investigators she still owed $400,000 on her mortgage.[86] This was not true. During the same interview she claimed her husband drove a beat-up truck and she drove a Toyota because of their limited means and simple lifestyle.[87]  Pictures taken at the residence show a crossover SUV Lexus and another SUV crossover parked in their driveway.[88] Online real estate websites currently state this property has an estimated value of over $2 million,[89] providing a net equity value of approximately $1.7 million for this property.

d. An Office Building at 236 S Atlantic Blvd, Los Angeles, California obtained by the Quans in 1996 for $145,000.[90] The Quans borrowed $97,000.00 to secure that property in 1996.[91] Any other notes on the property have been satisfied.[92] Red Hearts Hospice, Inc., a Quan entity, operates out of this location.[93] This property has appreciated in value substantially in the twenty-six (27) years since acquisition and has substantial net equity.

e. Quan Healthcare Corporation   Helen Quan's LinkedIn profile lists herself as the Chief Executive Officer of this entity since 2013.[94]

f. Red Heart's Hospice, Inc.   Helen Quan is Chief Executive Officer and Chief Financial officer of this entity.[95] Nelson Quan is also on the Board of Directors.[96] According to its public

---

[86] Dkt. 156 - Exhibit 2E Quan Interview 5 at p.1: ¶ 2

[87] Id. at p.2: ¶ 2

[88] Dkt. 156 - Exhibit 5C4. Donner Lexus

[89] Dkt. 156 - Exhibit 5C5. Donner Place Value

[90] Dkt. 156 - Exhibit 5D. Quan Property 4 at p.3

[91] Id. at p.3

[92] Dkt. 156 - Exhibit 5D. Quan Property 4 at p.1

[93] Dkt. 156 - Exhibit 5F1. Red Heart's Hospice

[94] Dkt. 156 - Exhibit 5E. Quan Health Care Corporation

[95] Dkt. 156 - Exhibit 5F1. Red Heart's Hospice

[96] Id.

website, www.redheartshospice.com,[97] Red Heart's Hospice provides skilled nursing, certified home health aides, medical social services, dietary services, and hospice care plans. They serve Los Angeles, San Bernardino, Ventura, Orange & Riverside Counties, with multilingual staff for English, Spanish, Chinese, Armenian, Russian and Tagalog.  Their website claims their hospice team has physicians, skilled nurses (RN, LPN, CNA), Dieticians, Home Health Aides, Medical Social Workers, Spiritual Counselors, & Hospice Care Volunteers.[98]  Their customers have left Yelp reviews, to which Helen Quan responds in her capacity as owner. According to public records available online, this business has at least twelve (12) employees, not counting those with whom they engage as health service contractors and was provided a Paycheck Protection Loan on that basis from Wells Fargo National Bank to keep those employees, which was forgiven.[99]

     g. <u>Service Station Property at 240 S Atlantic </u>Blvd, Los Angeles, California.  This property is adjacent to the primary site location of the Quan Service Center and the loans associated with it are bundled with item h below. The Quans acquired this property prior to May 14, 2004, and at that time it had no encumbrances against it.[100]  On April 25, 2006, the Quans took out a first and second on this property for a combined encumbrance of $984,500.[101]  On May 29, 2015, they refinanced these loans by obtaining the Umpqua Bank 7A SBA loan for $1,778,000, which allowed them to purchase the Chevron Building and Chevron Equipment they had previously leased resulting in substantial net annual savings appliable to profits.[102]

---

[97] Dkt. 156 - Exhibit 5F2. RHH WEB ALL; Note: Attached as an exhibit are printed copies of selected portions of this website.  Viewing the website online is more helpful. The printed copies are provided in case this website is taken down in response to this filing.

[98] Dkt. 156 - Exhibit 5F3. RHH Web 1

[99] Dkt. 156 - Exhibit 5F4. RHH PPP

[100] Dkt. 156 - Exhibit 5G1.  Quan Property 5 Gas Station at p.3

[101] *Id.* at p.3

[102] *Id.* at p.2 & Dkt. 156 - Exhibit 3A Baxter at p.3: ¶2-3

SBA loans generally have a longer term, a higher interest rate, but require an extraordinarily low equity basis to qualify compared to conventional commercial loans.  An SBA 7A loan generally cannot be refinanced into another SBA 7A loan. On February 15, 2019, based on the substantial real property appreciation of the QSC sites, the Quans were able to retire their Umpqua SBA bank loan and obtain a conventional commercial loan for $1,850,000 with Bank of the West at a low 4.75% interest rate.[103]  Conventional commercial loans generally require a 40% equity basis on special use properties and only loan against the real property, which includes the land and the building on the land.  Based on the Bank of the West loan amount, the real property alone was worth *at least* $3 million in 2019 and had been required to be appraised with a value of *at least* $2.3 million in 2015 for the SBA 7A loan, which it easily did.[104]  The 40% equity basis for the conventional business refinance loan, does not include equipment or business value. So, in addition to the *at least* $3 million valuation of the real property in 2019, the equipment value of the pumps, individual underground storage tanks for diesel fuel, 87 rated fuel, and 91 rated fuels for this gas station is worth an additional $1 million. The business value of similarly situated "branded" stations, like this Chevron station, has an independent valuation of between $3 to $4 million. The inventory value for fuel has an approximate value of $200,000, and the inventory of the convenience mart, which sells alcohol, has an approximate $150,000 value.  Based on this and the value of the loan QSC obtained in 2019, a conservative sale price value of the QSC in 2019, lock, stock, and barrel was approximately $7.5 million.  Net profits from sales when an operator owns everything, lock, stock, and barrel on a similarly situated gas station convenience mart property can be in the $550,000 to $1 million a year range.

h. Service Station Property at 250 S Atlantic Blvd, Los Angeles, California.  This is the

---

[103] *Id*. at p.2; Dkt. 156 - Exhibit 2B. Quan Interview 2 at p.2

[104] Dkt. 156 - Exhibit 5G2. QSC Required Loan Documents

primary location of the Quan Service Center.  The discussion for item (g) applies equally to this property. The Quans acquired this property in 1998.[105]  Public records indicate the QSC had at least eight (7) employees in 2019 and received a PPP Loan on that basis to keep those employees, which was forgiven.[106]

i. A Rental Residence at 1800 N Madison Avenue, Pasadena, California. The Quans acquired this 5 bedroom, 3 bath residence on June 16, 2013, for $365,000.[107]  According to public listings online, the value of the home at the time of the last sentencing was approximately $1.4 million.[108] In a government interview before the previous sentencing in 2022, Ms. Quan claimed to government investigators that this house was not a rental property[109], however the Quans then had current individual bedroom rental listings for at least two (2) of this home's five (5) bedrooms for $1000 and $1350 per month respectively readily apparent online.[110] On November 1, 2021, four (4) years after the end of the relevant conduct in this case the Quan's chose to take out a new loan for this rental property for $548,250.[111]  This property has a net equity of at least $900,000 with rental income available to pay the newly obtained note against it.

j. Tujunga Canyon Residential Lot – Housing Tract 8303, Lot #307 - Acquired by the Quans on July 12, 2010. Owned free and clear since acquisition.[112]

k. 20 Acre Parcel in Riverside County APN[113] 750-240-001: – On May 17, 2004, the

---

[105] Dkt. 156 - Exhibit 5H1. Quan Property 6

[106] Dkt. 156 - Exhibit 5H2. QSC PPP at p.4

[107] Dkt. 156 - Exhibit 5I1. Quan Property 7 at p.7

[108] Dkt 156 – Exhibit 5I2.  Quan Property 7 Value

[109] Dkt. 156 - Exhibit 2E. Quan Interview 5 at p.1: ¶2

[110] Dkt. 156 - Exhibit 5I3. Quan Property 7 Room Rental Listing

[111] Dkt. 156 - Exhibit 5I1. Quan Property 7 at p.3

[112] Dkt. 156 - Exhibit 5J. Quan Property 9

[113] APN stands for Assessor's Parcel Number. It is a unique number assigned by the Tax Assessor to a piece of property or each tract of land within a county that distinguishes one property from the next.

Quan's transferred this acreage they already had owned free and clear to the QFT.  It is still unencumbered.[114]

l.  20 Acre Parcel in Riverside County APN 750-240-002: -- On May 17, 2004, the Quans transferred this acreage they already owned free and clear to the QFT.  It is still unencumbered.[115]

m.  20 Acre Parcel in Riverside County APN 750-240-003: -- On May 17, 2004, the Quans transferred this acreage they already owned free and clear to the QFT.  It is still unencumbered.[116]

n.  18.54 Acre Parcel in Riverside County APN 750-240-004 -- On May 17, 2004, the Quans transferred this acreage they already owned free and clear to the QFT.  It is still unencumbered.[117]

o.  .66 Acre Parcel in Riverside County APN 750-240-005 -- On May 17, 2004, the Quan's transferred this acreage they already owned free and clear to the QFT.  It is still unencumbered.[118]

Ms. Quan has misled government investigators claiming she makes very little money, being lucky sometimes if she makes $5,000.00 per month.[119] When confronted by government investigators with the reality of her rental properties during the informal objection process in early 2022, she continued to cry poor, and claimed that three (3) or four (4) of her at least twenty-four (24) tenants have not paid rent in a year and half.[120] Ms. Quan, as a sophisticated and savvy CEO has been savvy enough to refinance her many properties over the course of the last twenty-five (25) years to her benefit, to seek PPP loans, to regularly use the services of attorneys, loan brokers, consultant administrators, and claims to have hired property managers, who assuming

---

[114] Dkt. 156 - Exhibit 5K. Quan Property 10

[115] Dkt. 156 - Exhibit 5L. Quan Property 11

[116] Dkt. 156 - Exhibit 5M. Quan Property 12

[117] Dkt. 156 - Exhibit 5N. Quan Property 13

[118] Dkt. 156 - Exhibit 5O. Quan Property 14

[119] Dkt. 156 - Exhibit 2E Quan Interview 5 at p.2: ¶4

[120] *Id.* at p.3: ¶2

her claims of not receiving rent are true, would be aware that under the California COVID-19 Tenant Relief Act the California government would provide immediate relief for landlords of an 80% payout to them of household rental arrears accumulated from April 1, 2020, through March 31, 2021.

Ms. Quan's extraordinary net worth, even in 2014, placed her in the top 1% of United States family net worth even in 2020.[121]  Her net worth is even more now, nine (9) years later. Despite this, Ms. Quan has verbally minimized her assets to government investigators, verbally exaggerated hardships, and portrayed herself as unsophisticated in business.  She has told investigators that she and her husband do not like to borrow money or have debt, failing to mention that she routinely borrows money and assumes debt to successfully grow her financial empire.  At times she has led investigators to believe that her husband's debilitating stroke and health history, that began twenty-six (26) years ago,[122] was somehow caused by the defendant, and that he had a stroke when he found out about the debt.[123]  Text messages between Ms. Quan & Mr. Patterson provided in discovery, reveal she was telling her husband about the transactions and the debt throughout the scope of the relevant conduct. She has misled government investigators to believe that two (2) loans, well more than anything she provided to Mr. Patterson, one, years after the events of this case, and the payments on these loans are somehow Mr. Patterson's responsibility and the payments on these loans are keeping Ms. Quan from retiring.[124]

In a February 11, 2012, statement to a special agent with the Federal Bureau of Investigations, Quan said that she will not be able to retire when she had planned as she is $1,143,000 in debt from this case, has a very small retirement account, wants to retire and live

---

[121] Dkt. 156 - Exhibit 5P.  Top 1%

[122] Dkt. 156 - Exhibit 2A Quan Interview 1 at p.1:15-18

[123] Second Revised PSR ¶28

[124] Dkt. 156 - Exhibit 2B. Quan Interview 2 at p.2

simply but now she cannot. She claims she is unable to afford to care for her ailing husband, is forced to now leave him home alone uncared for, is "starting all over" after years of work, and that it would take over ten years to recover from this, if ever, claiming she is lucky is she makes $5,000 a month.[125]

Despite her claims, Helen Quan has made no substantial change of plans or postponed her retirement plans because of the losses in this case. She was always planning on expanding her healthcare operation and still is. She has more than enough net equity in her many assets to sell and retire right now, live in luxurious comfort, and provide for her husband's care needs. If she chooses not to retire and continues to build her financial empire, she has enough income to provide for him and his care needs.

Finally, Ms. Quan has told government investigators that Mr. Patterson told her he put everything in his wife's name to avoid paying taxes,[126] owned no properties because he did not want to get sued, and because he had credit problems.[127] Despite this, she had no reservations, worries, or qualms about partnering with Mr. Patterson in a million-dollar business transaction, and advancing substantial monies, unsecured, with an admitted tax cheat, worried about lawsuits, who, according to her, had an admitted history of not paying his debts.

## G. CUSTODIAL HISTORY

### 1. COVID INFECTIONS 1 & 2; COLLAPSED LUNG; QUARANTINE ISOLATION

Since entering custody, Mr. Patterson has spent large portions of his custody in quarantine, isolated, with no visitation, yard time, or access to a library. When he entered custody on October 21, 2020, six months after the pandemic began, he had a well-documented history of

---

[125] Second Revised PSR ¶28 & Dkt. 156 - Exhibit 2E. Quan Interview 5

[126] Second Revised PSR ¶ 32 & ¶121. Note: The only property his "wife"/fiancé owns is her personal residence.

[127] Dkt. 156 - Exhibit 2A. Quan Interview 1 p.5:19-22

morbid obesity, asthma, diabetes, gastric bypass sleeve, hypertension, and sleep apnea, and other medical conditions.[128] Fourteen (14) days after surrendering to custody, an inmate with COVID-19 was introduced into his four (4) bed medically protected cell.[129] His respiratory symptoms and distress had become noticeably worse to *anyone* speaking to him on jail phone calls[130]. He complained of severe headaches, and trouble breathing. On Sunday, December 20, 2020, he went thirty (30) hours without contacting his family or counsel[131]. This was the longest he had ever gone without calling either[132]. That evening, he called a family member claiming he had been too weak to get out of bed[133]. On Monday, December 21, 2020, he reported to counsel that he felt as if his lungs had broken glass in them, jabbing and stinging him as he breathed, and it felt like there was a weight on them.[134] He reported feeling spent and fatigued, as if he had been hit by a truck over the previous six days.[135]

Months later, he suffered a collapsed lung.  He sustained the injury from another inmate at the Fresno County Jail.[136]

He received two COVID-19 vaccinations and requested a booster on November 20, 2021, after the CDC recommended it and after boosters were in large supply to the general public,

---

[128] Second Revised PSR ¶126-127

[129] *Ibid.*

[130] Dkts. 16,17,18 - Dkt. 156 - Exhibit C

[131] *Ibid.*

[132] *Ibid.*

[133] *Ibid.*

[134] *Ibid.*

[135] *Ibid.*

[136]  Second Revised PSR ¶125. "The defendant reports he was assaulted while housed at the Fresno County Jail. He indicates his right lung collapsed and he had difficulty breathing for three to four months after the incident. Medical records obtained from Fresno County indicate on March 28, an evaluation of x-rays showed "atelectasis is present within the right lower lung field." Atelectasis is a collapsed lung.

however, none were available at the McFarland facility[137].  He contracted a second COVID-19 infection at McFarland on January 20, 2022.[138]  He received treatment for lung related breathing issues.

### 2. GAMBLING OPPORTUNITIES & DEFENDANT MENTAL STATE

Mr. Patterson requested a transfer to Central Valley Annex jail, because the conditions at the Fresno County Jail were untenable, with repeated threats, violence, and other issues exacerbating his undiagnosed mental health conditions, including gambling related problems and altercations.

### 3. CENTRAL VALLEY ANNEX JAIL TRANSFER TRANSFORMATION

On May 12, 2021, the defendant was transferred from the Fresno County Jail to the Central Valley Annex jail. According to the Central Valley Annex Jail, since the defendant had been an inmate, he has had no disciplinary reports or incidents[139]. He participated in a faith-based parenting class titled "Malachi Dad's" The defendant has several Certificates of Completion from the Rock of Ages Prison Ministry, Discipleship Institute[140].

Mr. Patterson requested the literature catalogue of Gambler's Anonymous be sent to him, but because the full catalogue was only available from Amazon and shipments from Amazon are not allowed, the shipments were returned.[141] Barnes & Noble, the only Bookseller for which the facility will allow shipments does not carry the full catalogue. There are no known treatment programs at Central Valley Annex Jail or at other BOP facilities that address Gambling Disorder.

---

[137] Dkt. 156 - Exhibit 6A. Request for Booster & Response

[138] Dkt. 156 - Exhibit 6B. 2nd Incident Covid McFarland

[139] Second Revised PSR ¶14

[140] *Id.*

[141] Dkt. 156 - Exhibit 6C. Gambler's Anonymous Reading Materials Jail

Mr. Patterson, as he came down from his ongoing episodic bout of his untreated severe Gambling Disorder and his undiagnosed Bipolar Disorder while at Central Valley Annex, recognized the error of his ways, and accepted responsibility.  It was like coming out of a thick fog.

### 4.  BOP Custody

While in BOP custody, Mr Patterson sought to better himself by completing his GED on September 7, 2022.[142]  While in BOP custody, there has been no treatment for his documented severe gambling disorder and Bipolar Disorder.  His current state of recovery remains fragile, without access to group support, which is necessary to overcome and recover from Gambling Disorder, especially without medical treatment for his previously undiagnosed Bipolar condition. While punishment is warranted in this case, it does nothing to treat the underlying causes of the behavior.

Mr. Patterson desires to seek treatment, recover, and make full financial amends to those he has harmed.[143]

## III.    OBJECTIONS

## A. OBJECTION TO ¶68 – MR. PATTERSON SHOULD NOT RECEIVE A 2 LEVEL ENHANCEMENT FOR SUBSTANTIAL HARDSHIP TO THE VICTIM UNDER USSG §2B1.1(b)(2)(A)(iii)

Second Revised PSR ¶68 states: "Pursuant to USSG §2B1.1(b)(2)(A)(iii), if the offense resulted in substantial financial hardship to one or more victims, increase by two levels. Victim Helen Quan lost $1,143,000. In a statement in a special agent with the Federal Bureau of

---

[142] Dkt. 146

[143] Dkt.154-8

Investigations, Quan said that she will not be able to retire when she had planned as she is $1,143,000 in debt. It appears a two-level increase is appropriate."

USSG §2B1.1(b)(2)(A)(iii) Use application 4. Provides in relevant part:

> (F) Substantial Financial Hardship.—In determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim (i) becoming insolvent; (ii) filing for bankruptcy under the Bankruptcy Code (title 11, United States Code); (iii) suffering substantial loss of a retirement, education, or other savings or investment fund; (iv) making substantial changes to his or her employment, such as postponing his or her retirement plans; (v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and (vi) suffering substantial harm to his or her ability to obtain credit.

Here, while it is true that Ms. Quan's million-dollar loss is substantial, the substantialness of that loss is already reflected in the 14-level increase pursuant to USSG §2B1.1(b)(1)(H) to the base level of 7 for his offenses.  Ms. Quan's substantial loss, however, fails to rise to the level of substantial financial hardship under the enhancement. Here, Ms. Quan has not become insolvent, far from it. Her net worth has increased substantially since the offense. She did not file for bankruptcy. None of her various versions about the source of the funds she advanced ever attribute those advances from a retirement, education, savings, or other investment fund.  Even if she believes her entire net worth is the source of her eventual retirement, the funds she advanced are a small percentage of her total net worth. She has not made substantial changes to her employment because of the loss.  She continues to own QSC, continues to own substantial real estate investments and real estate, and has substantially expanded her healthcare business as planned. She could sell any of these enterprises, and with the net equity after the sale, live comfortably in retirement, both then and now.  She has not made significant changes to her living arrangements and continues to live in her home. She has suffered no loss to her ability to obtain credit.

29

The penalty imposed in USSG §2B1.1(b)(2)(A)(iii) is for cases where the defendant's conduct created economic devastation to the course of a victim's life.  That is simply not present in this case. Ms. Quan has a multimillion-dollar net worth and her statements alone in support of this enhancement are simply not credible as outlined extensively in the statement of facts. The two-level enhancement does not apply, should be stricken from the report, and not imposed.

## B. OBJECTION TO PSR ¶52 NAMING STATE OF CALIFORNIA TAX BOARD AS PART OF THE RESTITUTION TOTAL

PSR 52 states in relevant part:

"……This total is based upon the what the defendant received from victim Helen Quan (Counts 1 through 6), the amount Bank of America could not recover (Count 7), and the taxes owed to the Internal Revenue Service and State of California Franchise Tax Board (Count 8)."

The 9th Circuit ruled when remanding this case for resentencing that:

"Second, the district court plainly erred by including the loss that Patterson caused the State of California Franchise Tax Board in its restitution order. Restitution ordered as a condition of supervised release is limited to losses caused by the actual offense of conviction unless that offense includes a conspiracy, scheme, or pattern of conduct as an element. *Thomsen*, 830 F.3d at 1064; *Batson*, 608 F.3d 630, 636–37 (9th Cir. 2010). Because federal tax evasion under I.R.C. § 7201 includes none of these elements, the district court lacked authority to include the state tax loss in its restitution order."[144]

References to the State of California Franchise Tax Board and losses related to them should be stricken.

## C. OBJECTION TO MAKING RESTITUTION DUE & PAYABLE IMMEDIATLEY

Restitution can only be made "due and payable immediately" if the court makes the requisite finding that the defendant has the ability to pay restitution immediately, otherwise the court must set a payment schedule.  18 U.S.C 3664(f); *United States v. Holden*, 908 F.3d 395,

---

[144] Dkt. 187 pg. 6

403-04 (9th Cir. 2018).

PSR ¶54 references a Writ of Continuing Garnishment from accounts frozen as a result of the prior sentencing order that has since been vacated and remanded. Primarily at issue is an account frozen at JPMorgan Chase Bank that now has funds of: $39,454.81 (SBA Elite Inc. Account xx5263).[145] These funds are in a corporate account. There were automatic incoming wire deposits into that account which occurred after the now vacated sentencing determination in April 2022. These automatic wire transfers were from those who had preexisting contracts with SBA Elite Corp. for SBA referral agreements that were begun prior to the sentencing, and not completed until after the sentencing. No more completed transactions are expected to be wired into that account from SBA referral sources. The SBA Elite Corp had debts and obligations for leases, business lines, and separate high speed internet communication systems, among other things. The corporation also had a credit card that is currently owed over $5,000 and is no longer operational. Those corporate obligations still exist and are now in default.  Mr. Patterson has been in custody were communication has been extremely difficult. There have been no funds to continue paying accountants and lawyers to close SBA Elite.

Mr. Patterson is willing to voluntarily surrender the amount of funds in the account towards the restitution amount if withholding is taken out for 2022 and 2023 state and federal taxes. If the government seizes the full amount from the corporate account, it automatically also becomes personal income to him which has new tax consequences. The terms of the prior sentencing were that Mr. Patterson would be garnished on his gross earned income at 10%. Seizing these funds as if they are already his personal income now, which they are not, would have resulted in a 10% payment towards restitution, not recovery of the full amount. Seizing the

---

[145] PSR ¶54

amount and then leaving no monies to satisfy newly incurred tax obligations is fundamentally unfair and frustrates the aims of justice and rehabilitation.

Notwithstanding this account, Mr. Patterson requests the court find Mr. Patterson does not have the ability to pay restitution immediately and set a payment schedule that begins upon Mr. Patterson's release and when he begins earning income.

**IV.**

**A SENTENCE OF TIME SERVED WITH CONDITIONS FOR INPATEINT COMPREHENSIVE DUAL DIAGNOSIS GAMBLING BIPOLAR, ANXIETY, AND OTHER ADDICTION AND MENTAL HEALTH TREATMENT IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO COMPLY WITH THE PURPOSES OF 18 U.S.C. §3553 (2) & (4)**

Pursuant to USSG § 3553a (2) & (4) any sentence imposed must afford adequate deterrence to criminal conduct and provide the defendant with needed medical care or other correctional treatment in the most effective manner.

Mr. Patterson has been diagnosed with a severe Gambling Disorder and Bipolar Disorder, disorders listed in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5), relied upon by the Ninth Circuit in *United States v. Cantu*, 12 F.3d 1506, 1512-1513 (9th Cir. 1993).[146] Mr. Patterson's severe Gambling Disorder and undiagnosed Bipolar Disorder contributed substantially to the commission of the offenses. Despite gambling related issues having a history of being viewed as a shortcoming of intelligence, control, or moral fiber, pathological gambling has been recognized as a ***medical condition.*** The most recent version of DSM (DSM-5, 2013) now lists gambling as "Gambling Disorder" and has moved it from impulse

---

[146]Dkt. 156 - Exhibit 1 Howsepian Report at p. 3

control disorders to the addictive disorders section, among similar disorders such as alcohol and substance use. Gambling is viewed on a par with alcohol and drug addiction and is medically regarded as arising from the same neurological and biogenetic roots as alcohol and drug addiction. This is a recent and significant departure from past views on gambling.

From 2003 through 2017, Mr. Patterson suffered periodically from the most extreme Gambling Disorder Dr. Howsepian has evaluated in over 20 years of practicing psychiatry.[147] According to Dr. Howsepian, Mr. Patterson's undiagnosed Bipolar Disorder "adds substantial fuel to the fire of his gambling addiction:  profoundly increasing his energy, altering his mood, decreasing his need for sleep, and further impairing his judgment."[148]

In Dr. Howsepian's professional opinion, primarily as a result of a profoundly severe Gambling Disorder, at the time of the offenses, Mr. Patterson was greatly impaired in his ability to understand the wrongfulness of his actions, to appropriately exercise his power of reason, and to control his offensive behavior.[149]  In other words, as a result of a severe Gambling Disorder, Mr. Patterson was both cognitively impaired (i.e., an inability to exercise the power of reason) and volitionally impaired (i.e., an inability to control behavior that the person knows is wrong).

The indictment alleges, and Mr. Patterson has admitted, he used the money he earned to gamble and avoid paying taxes and that he made false representations to Ms. Quan and used the funds Ms. Quan gave him to gamble.[150]  Relying on others to provide money for gambling losses most often occurs among those with a severe gambling disorder and occurred in the case of Mr. Patterson.[151]

---

[147] Second Revised PSR ¶133

[148] Second Revised PSR ¶133

[149] Second Revised PSR ¶134

[150] Dkt 1 at ¶¶15 and 38(c); Dkt 150-6

[151] Dkt. 156 - Exhibit 1 Howsepian Report at p.35

As early as 2003, Mr. Patterson suffered from a severe Gambling Disorder fueled by his undiagnosed Bipolar Disorder.[152]   In 2014, well after evidencing a severe Gambling Disorder, Mr. Patterson was prescribed Xanax by his primary care physician (PCP) to treat an anxiety disorder, which according to Dr. Howsepian is commonly associated with Bipolar Disorders.[153] However, merely attempting to treat anxiety, that often accompanies Bipolar Disorders, with an antianxiety agent such as Xanax is wholly inadequate for controlling the underlying Bipolar Disorder itself.[154]  Mr. Patterson's dependency on Xanax was a result of misdiagnosis and treatment for the true underlying causes of his issues.

Evidence shows that Mr. Patterson's severe Gambling Disorder impaired the judgment of a successful and caring man, contributing to a tremendous extent to the commission of the offenses.  Common themes are reflected in letters submitted on behalf of Mr. Patterson from business acquaintances, members of the community, friends, and family, specifically: (i) how both financially and emotionally, others trust him, have confidence in him, and can depend on him; (ii) how he was a consummate professional and helped save small businesses; (iii) how much he loves his family and friends and is a mentor to multiple people;  (iv) and how he is generous and responsive to the needs of others, including strangers.[155]

As just a few examples, Ron Kramer of Thermolife describes how Mr. Patterson helped him obtain SBA financing and accomplish his dream for himself and his businesses.[156]  Jennifer Kim of Kochi BBQ wrote:

---

[152] Dkt. 156 - Exhibit 1 Howsepian Report at p.37

[153] Dkt. 156 - Exhibit 1 Howsepian Report, p.47 & Second Revised PSR ¶127.  [Dr. Howsepian's report notes that Mr. Patterson was prescribed Xanax for approximately 7 years, until the time of his being taken into custody on the current indictment, which was October 21, 2020. See Dkt. 156 - Exhibit 1 Howsepian Report, p. 5 & Second Revised PSR ¶10.]

[154] Dkt. 156 - Exhibit 1 Howsepian Report at p. 47.

[155] Dkt. 156 - Exhibit 1 Howsepian Report at p.26

[156] Dkt 154-7 at 66/69

> I don't know what would have happened without Ken's help.  I can tell you Ken is a professional of the highest caliber.  His knowledge in the industry is a blessing to small businesses trying to get the help they need.  The only problem is there aren't enough Ken Patterson's out there to help our communities these days.  Ken has never charged for his services . . .[157]

Included among the many letters describing Mr. Patterson's character is a letter from Marcell Harris, Founder of "One of a Kind" Fundraising.[158]  Mr. Harris describes witnessing Mr. Patterson's care for other people, supporting high school athletics, and helping many battered and homeless women, along with their children in the Monterey County Woman's Shelter, Mr. Harris wrote:

> Witnessing Mr. Patterson's care for others I reached out to him on social media as we were having difficulty obtaining and fulfilling all the wish list items that mothers and children had asked for in hopes that he would be able to assist. Thankfully, Ken was quick to respond and offered to help in any way that he could.  I provided him a list of women and their children that needed help, as these families still had no sponsor and time was running short to fulfill their lists.  To my amazement, Ken volunteered to fill the entire list of multiple battered women, some with up to 6 children.  To start he had wo families of women and children, but as time was winding down, I reached him to see if he could assist with a few more and to my surprise he took on more women and children.

> In total he single handedly assisted 21 persons in the shelter which was an extreme blessing as the number of children that these woman had ultimately made it difficult to find sponsors who would be able to fulfil their list.  Ken went above and beyond to gather clothes and toys for each of the children and individually wrap them to ensure the children would feel the complete joy of the Holiday season although dealing with their current misplacement and living arrangements.[159]

When considering the offenses, he committed and the whole of Mr. Patterson, the childhood he overcame, his success and hard work, love of family, and care for community and those in need, Mr. Patterson's severe Gambling Disorder, fueled by his undiagnosed Bipolar

---

[157] Dkt 154-7 at 24/69

[158] Dkt 154-7 at 25/69

[159] *Id.*

Disorder, greatly impaired his power of reason and control of his behavior.  The disorders'

impairment negatively affected Mr. Patterson's first marriage, which ended in divorce, and was

observed by Mr. Patterson's ex-wife, Nicole Elsea, to whom Mr. Patterson was married from age

19 to 23.[160]  Ms. Elsea describes Mr. Patterson as unable to control his gambling and acting

consistent with being Bipolar since she has known him struggling with it.[161]

Mr. Patterson gambling addiction started when he was stationed in Nevada with the U.S.

Navy.[162]  He would gamble as much as he could, three to four times a week, $300 to $400 a

time.[163]  His gambling made him "broke" and in need for money for food and gambling,

prompting him to try and cash a per diem check that was meant for a naval officer, resulting in

him being administratively discharged from the Navy.  *Id*.  Regarding his cashing the per diem

check, Dr. Howsepian's report notes the undiagnosed Bipolar Disorder contributing to (or

fueling) Mr. Patterson's gambling:

> He had, he said, never tried doing anything like that before.  He also reports
> borrowing money to gamble from his paternal grandmother (now deceased) to pay
> bills and to gamble.  He later stated that "gambling took my life over.  I would go
> in cycles.  I would gamble, then I didn't want it", reflecting a possible contribution
> from an episodic ("bipolar") mood disorder.[164]

Mr. Patterson went on gambling binges, his loses grew to $20,000 to $30,000 a month and

even worse, by the end of March 2017, he had gambled $600,000 in less than a month.[165]

Multiple employees of the 500 Club Casino were interviewed by the FBI (including the General

Manager, five card dealers, a "prop" player, and cage cashier) and informed the FBI that Mr.

---

[160] Second Revised PSR ¶117

[161] Dkt 154-7 at 48/69 & Dkt. 156 - Exhibit 1 Howsepian Report at p. 28

[162] Second Revised PSR ¶117

[163] Dkt. 156 - Exhibit 1 Howsepian Report at p.36

[164] *Id*. at p.37

[165] Second Revised PSR ¶117 & Dkt. 156 - Exhibit 1 Howsepian Report, p.37

Patterson played in large, high limit games, did horribly, and lost lots of money.[166]  When Mr.

Patterson lost, he would get angry, get more chips, and continue to play.[167]   He was the "most

egregious" player at the 500 Club Casino.[168]  He would play one game that would last for days,

he would continue to "chase" the money, and just continue losing.[169]   As noted by Dr.

Howsepian, the density of withdrawals from his credit card for gambling purposes:

> Indicates a kind of cluster of gambling activity that would be expected in one who
> not only had a Gambling Disorder but also a Bipolar Disorder.[170]

Richard Barrera, a card room dealer at the 500 Club Casino reported to the FBI that Mr.

Patterson is a gambling addict, one of the worst he has ever seen, and that they let him continue to

play because he lost and the 'house' would make a lot of money on him.[171]  According to Steven

Xiong, a poker dealer at the 500 Club Casino, Mr. Patterson lost $200,000 in one game that lasted

a few days, which Xiong described as an "insane" amount and the biggest loss in poker that

Xiong has ever heard of.  *Id*.  According to Xiong:

> Patterson was playing that game on that Tuesday when Xiong was dealing, and the
> game was still going on Friday when Xiong returned to work.[172]

A primary rational for punishment, "desert (blameworthiness), loses some of its bite

because those with reduced ability to reason or to control their impulses are less deserving of

punishment than those who act out of viciousness or greed.[173] Similarly, deterrence has less value

as a rational for punishment because those with reduced capacities are less susceptible to a system

---

[166] Dkt. 156 - Exhibit 1 Howsepian Report at p.39

[167] *Id*.

[168] *Id*.

[169] *Id*.

[170] Dkt. 156 - Exhibit 1 Howsepian Report at p.40

[171] *Id*. at p. 41

[172] *Id*.

[173] *United States v. Cantu, supra,* 12 F.3d at 1516.

37

of punishment and reward.[174]

Mr. Patterson has been re-accepted into The Right Action Gambling Program at the Beit T'Shuvah Residential Treatment Center.[175]  Mr. Patterson's cost of care will be covered by a scholarship.[176]  Upon arrival at the program an addiction counselor, a spiritual counselor, a therapist, and a case manager will be assigned to Mr. Patterson, he would meet individually every week with each of these assigned specialists.[177]  At the same time, he would participate in group therapy, attend 12-step meetings, and drug test.[178]   He would also receive psychiatric care as needed.[179]

USSG § 3553a (2) (D) requires the court to weigh and consider how to provide the defendant with needed medical care, or other correctional treatment in the most effective manner. Based on Patterson's medical condition, gambling treatment is necessary, yet no treatment options exist at BOP to sufficiently treat Gambling Disorder, particularly, a case as severe as Mr. Patterson's.

While the Second Revised PSR recommended a variance of only six months due to Mr. Patterson's Gambling Disorder, it failed to consider that no treatment options for gambling exist at BOP. Even attempts at procuring access to the full catalog of self-help reading, via Gamblers Anonymous, could not be received at the Federal Facility where the defendant resides. Even if such materials were available in custody, the materials themselves provide that treatment and recovery are not effective by reading alone. Group treatment is essential to recovery. In addition,

---

[174] Id.

[175] Dkt 156 - Exhibit 7A, was an acceptance letter, dated November 5, 2021. A new acceptance letter dated June 23, 2023 will be provided to the court before sentencing on this matter.

[176] Id.

[177] Id.

[178] Id.

[179] Dkt. 156 - Exhibit 7B. Beit T'Shuvah at a Glance

prisons are rampant with gambling opportunities, and physical violence when debts are not paid. Mr. Patterson is not only an extreme compulsive gambler, but he is also not particularly good at it, losing all the time. Without treatment and support his fragile state of current transformation is unlikely to be maintained. He has no control over when an episode of mania which fuels his gambling disorder will happen without medication and treatment.

Mr. Patterson has spent over eighteen (35) actual months in custody and has received good time credits during his BOP stay.  The  opportunity to participate in a state of the art, cutting edge residential gambling treatment program at Beit.T'Shuvah, for a six (6) month period, that can help treat all of his psychiatric medical conditions and childhood trauma is truly the course of action that can have lasting change and at the same time protect the public in the future from a recurrent episode of severe Gambling Disorder fueled by the Bipolar Disorder. Treatment will give Mr. Patterson the tools he needs to recover and check his own conduct before it becomes a problem again.

When considering the nature of the offense and the context of Mr. Patterson's history and characteristics, mental and emotional conditions, a sentence of credit for time served with release conditions that include this residential treatment, and counseling, would be sufficient, but not greater than necessary, to comply with the purposes of §3553(a)(2).

Respectfully submitted,


Dated: August 23, 2023                            /s/ *Galatea DeLapp*
                                                  GALATEA DeLAPP
                                                  Attorney for Defendant
                                                  Kenneth Shane Patterson